**UNITED STATES of America, Petitioner,**

v.

**UNITED STATES DISTRICT COURT FOR the EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION and Honorable Damon J. Keith, Respondent.**

**No. 71–1105.**

United States Court of Appeals, Sixth Circuit.

April 8, 1971.

Certiorari Granted June 21, 1971.

See 91 S.Ct. 2255.

Weick, Circuit Judge, dissented and filed an opinion.

Robert L. Keuch, Dept. of Justice, Washington, D. C., for petitioner; Rob-

ert C. Mardian, Asst. Atty. Gen., Ralph B. Guy, Jr., U. S. Atty., Detroit, Mich., Kevin T. Maroney, Daniel J. McAuliffe, George W. Calhoun, Attys., Dept. of Justice, Washington, D. C., on brief.

William M. Kunstler, New York City, pro hac vice, by special leave of Court, with whom Hugh M. Davis, Jr., Detroit, Mich., and Leonard I. Weinglass, Newark, N. J., were on the brief.

Herman Schwartz, Buffalo, N. Y., Melvin L. Wulf, New York City, Erwin Ellmann, Detroit, Mich., on brief for American Civil Liberties Union, as amicus curiae.

Before PHILLIPS, Chief Judge, and WEICK and EDWARDS, Circuit Judges.

EDWARDS, Circuit Judge.

At issue in this case is the power of the Attorney General of the United States as agent of the President to authorize wiretapping in internal security matters without judicial sanction.

This case has importance far beyond its facts or the litigants concerned.

If decided in favor of the government, the citizens of these United States lose the protection of an independent judicial review of the cause and reasonableness of secret recordation by federal law enforcement of thoughts and expressions which had been uttered in privacy. If it is decided in favor of the respondent, it may prejudice an important criminal prosecution. And more important, of course, in all future surveillances undertaken in internal security matters, it may add at least some dimension of risk of exposure of federal investigatorial intentions.

The background of this case is the pending trial in the United States District Court for the Eastern District of Michigan in Detroit of three young men for conspiracy to destroy government property in Ann Arbor, Michigan, in violation of 18 U.S.C. § 371 (1964). One of them named Plamondon was also charged with destruction of government property in a value exceeding $100, in viola-tion of 18 U.S.C. § 1361 (1964). The particular case before us is a petition for writ of mandamus filed originally in this court by the United States to compel the District Judge who is presiding at the Detroit trial to vacate an order directing the United States to "make full disclosure to defendant Plamondon of his monitored conversations."

STATEMENT OF FACTS

For purposes of this case, we accept the statement of facts from the petition filed by the United States:

"On December 7, 1969, defendants in the court below were indicted by a Federal Grand Jury for destruction of Government property in violation of 18 U.S.C. 1361. In the course of the pre-trial proceedings, defendants filed a motion for disclosure of certain electronic surveillance information. That motion was granted by respondent, and petitioner has been ordered by respondent to disclose the information sought. Respondent's Order is the subject of this petition.

"On October 5, 1970, defendants filed a 'Motion for Disclosure of Electronic or other Surveillance, For a Pre-trial Hearing, To Suppress Evidence and to Dismiss the Indictment.' * * *

"On December 18, 1970, petitioner filed, in response, an opposition to defendants' motion. By way of an affidavit of the Attorney General of the United States, John N. Mitchell, which was attached to petitioner's opposition, petitioner acknowledged that one of the defendants, Lawrence Robert "Pun" Plamondon, had participated in conversations which were overheard by government agents.[1] The logs of

"1. It is important to note at this point that although he was overheard, defendant Plamondon was not the object of the surveillance. This distinction apparently went unnoticed by respondent for he stated in his decision ordering disclosure that the Attorney General 'had authorized and deemed necessary the wire tapping of certain of

defendant Plamondon's conversations.'
* * *

"The sealed exhibit submitted to the court below will quickly demonstrate that defendant Plamondon was not the object of the surveillance, and petitioner respectfully refers this Court's attention to that exhibit and the additional sealed exhibit being made available to the Court for the grounds and objectives of the Attorney General's authorization." (Footnote in quotation.)

these surveillances were given to respondent in the form of a sealed exhibit for respondent's *in camera* inspection only and are available to this Court on those terms as well.

"Oral argument was had before respondent on January 16, 1971; on January 25, 1971, respondent holding that the surveillance was illegal, granted defendants' motion and ordered petitioner to disclose the information sought. Respondent then granted petitioner a 48-hour stay which was, in turn, extended to and including February 9, 1971, to afford petitioner an opportunity to present this matter to this Court."

To this statement of facts the United States also attached the affidavit of Attorney General Mitchell—the full context of which follows:

"JOHN N. MITCHELL being duly sworn deposes and says:

"1. I am the Attorney General of the United States.

"2. This affidavit is submitted in connection with the Government's opposition to the disclosure to the defendant Plamondon of information concerning the overhearing of his conversations which occurred during the course of electronic surveillances which the Government contends were legal.

"3. The defendant Plamondon has participated in conversations which were overheard by Government agents who were monitoring wiretaps which were being employed to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government. The records of the Department of Justice reflect the installation of these wiretaps had been expressly approved by the Attorney General.

"4. Submitted with this affidavit is a sealed exhibit containing the records of the intercepted conversations, a description of the premises that were the subjects of the surveillances, and copies of the memoranda reflecting the Attorney General's express approval of the installation of the surveillances.

"5. I certify that it would prejudice the national interest to disclose the particular facts concerning these surveillances other than to the court *in camera*. Accordingly, the sealed exhibit referred to herein is being submitted solely for the court's *in camera* inspection and a copy of the sealed exhibit is not being furnished to the defendants. I would request the court, at the conclusion of its hearing on this matter, to place the sealed exhibit in a sealed envelope and return it to the Department of Justice where it will be retained under seal so that it may be submitted to any appellate court that may review this matter."

This court stayed the order of the District Court pending hearing and final disposition of the petition for writ of mandamus.

From the above-quoted statement of facts, it appears that the exact question this court must answer is:

Where the Attorney General determines that certain wiretaps are "necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the government," does his authorization render such wiretaps lawful without judicial review?

## THE MANDAMUS QUESTION

■ Preliminary to answering this question, there is a challenge to our jurisdiction. It is claimed that mandamus is not an appropriate form of action in

which to review the question just posed in the context of the instant case. It is clear that the District Court order under attack is a pretrial order interlocutory in nature, and hence, not appealable under 28 U.S.C. § 1291 (1964) which conveys appellate power to this court to review only "final" orders of the District Courts. Cogen v. United States, 278 U.S. 221, 49 S.Ct. 118, 73 L.Ed. 275 (1929). Nor is the order here under attack subject to appeal under 28 U.S.C. § 1292 (1964), which grants appellate power to this court in certain limited classes of interlocutory orders, nor under 18 U.S.C. § 3731 (Supp. V, 1965–69), which deals specifically with criminal appeals.[1]

It is, of course, the general rule that mandamus may not be substituted for appeal. Roche v. Evaporated Milk Ass'n., 319 U.S. 21, 30–31, 63 S.Ct. 938, 87 L.Ed. 1185 (1943); Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 382, 74 S.Ct. 145, 98 L.Ed. 106 (1953); Black v. Boyd, 248 F.2d 156, 159 (6th Cir. 1957); Hoffa v. Gray, 323 F.2d 178, 179 (6th Cir.), cert. denied, 375 U.S. 907, 84 S.Ct. 199, 11 L.Ed.2d 147 (1963); University National Stockholders Protective Comm., Inc. v. University National Life Ins. Co., 328 F.2d 425, 426 (6th Cir.), cert. denied, 377 U.S. 933, 84 S.Ct. 1335, 12 L.Ed.2d 296 (1964).

Petitioner United States, however, points to the All Writs Statute (28 U.S. C. § 1651 (1964)) as source of this court's power to grant the writ prayed for and argues that this is an extraordinary case wherein the respondent has entered an illegal order which if allowed to stand, "would result in grave and irreparable harm to legitimate Governmental interests."

Concerning the use of mandamus in "exceptional cases," this court has said:

> "It is also well settled that although sparingly used, the power to issue a writ of mandamus exists and will be exercised by the court when in its dis-cretion the exceptional circumstances of the case require its use. * * * Its use in such exceptional cases, however, does not mean that the All Writs Statute grants to the appellate court a general [power] to supervise the administration of justice in the federal district courts and to review by writ of mandamus any unappealable order." Black v. Boyd, 248 F.2d 156, 159–160 (6th Cir. 1957).

*See also* Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932); La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); Will v. United States, 389 U.S. 90, 95–98, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967).

In this last case, Justice Black in a concurring opinion said:

> "I agree that mandamus is an extraordinary remedy which should not be issued except in extraordinary circumstances. And I also realize that sometimes the granting of mandamus may bring about the review of a case as would an appeal. Yet this does not deprive a court of its power to issue the writ. Where there are extraordinary circumstances, mandamus may be used to review an interlocutory order which is by no means 'final' and thus appealable under federal statutes." Will v. United States, *supra* 389 U.S. at 108, 88 S.Ct. at 280.

From what has already been said, it is obvious that we agree that this is in all respects an extraordinary case. Great issues are at stake for all parties concerned. Further, the government asserts the illegality of the order, that it represents an abuse of the District Judge's discretion, and claims that it will have the effect of forcing the government to dismiss the prosecution of one defendant.

If this were not enough to occasion our deciding this case on the merits rather than on procedural grounds, it also clearly appears that the issue posed here

---

1. The amendment to 18 U.S.C. § 3731, approved January 2, 1971, is by its terms inapplicable to this case. Pub.L. No. 91–644, § 14, 84 Stat. 1880 (Jan. 2, 1971).

is a basic issue which has never been decided at the appellate level by any court. It has been decided favorably to the government's position by two District Courts and adversely to the government by two others.[2] The Courts of Appeals have the power to review by mandamus "an issue of first impression," Schlagenhauf v. Holder, 379 U.S. 104, 110, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), involving a "basic and undecided problem." *Id.* at 110, 85 S.Ct. 234.

We hold that this court has jurisdiction to decide this petition.

## THE FOURTH AMENDMENT

The District Judge in issuing the disclosure order relied upon the Fourth Amendment to the Constitution of the United States, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. amend. IV.

In a series of cases, the United States Supreme Court has held that electronic surveillance and recordation by wiretap is a search and seizure governed by the Fourth Amendment. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967); Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L. Ed.2d 176 (1969); Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed. 302 (1969).

The basic holding of these cases is set forth in the *Katz* case by Mr. Justice Stewart:

"The Government urges that, because its agents relied upon the decisions in *Olmstead* [v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944] and *Goldman* [v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322], and because they did no more here than they might properly have done with prior judicial sanction, we should retroactively validate their conduct. That we cannot do. It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end. Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' Agnello v. United States, 269 U.S. 20, 33 [46 S.Ct. 4, 6, 70 L.Ed. 145], for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer * * * be interposed between the citizen and the police * * *.' Wong Sun v.

2. United States v. Dellinger, et al., Criminal No. 69–180 (U.S.D.C.N.D.Ill.E.D.) decided February 20, 1970; United States v. O'Neal, Criminal KC–CR. 1204 (U.S. D.C.D.Kansas) decided September 1, 1970; United States v. Smith, 321 F. Supp. 424 (U.S.D.C.C.D.California) decided January 8, 1971; and the instant case, respectively.

United States, 371 U.S. 471, 481–482 [83 S.Ct. 407, 414, 9 L.Ed.2d 441]. 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' United States v. Jeffers, 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59] and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment [18]—subject only to a few spe-

"18. See, *e. g.*, Jones v. United States, 357 U.S. 493, 497–499 [78 S.Ct. 1253, 1256–1257, 2 L.Ed.2d 1514]; Rios v. United States, 364 U.S. 253, 261 [80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688]; Chapman v. United States, 365 U.S. 610, 613–615 [81 S.Ct. 776, 778, 779, 5 L.Ed.2d 828]; Stoner v. California, 376 U.S. 483, 486–487 [84 S.Ct. 889, 891–892, 11 L.Ed.2d 856].

cifically established and well-delineated exceptions.[19]

"19. See *e. g.*, Carroll v. United States, 267 U.S. 132, 153, 156 [45 S.Ct. 280, 285, 286, 69 L.Ed. 543]; McDonald v. United States, 335 U.S. 451, 454–456 [69 S.Ct. 191, 192–194, 93 L.Ed. 153]; Brinegar v. United States, 338 U.S. 160, 174–177 [69 S.Ct. 1302, 1310–1312, 93 L.Ed. 1879]; Cooper v. California, 386 U.S. 58 [87 S.Ct. 788, 17 L.Ed.2d 730]; Warden v. Hayden, 387 U.S. 294, 298–300 [87 S.Ct. 1642, 1645–1647, 18 L.Ed.2d 782].

"It is difficult to imagine how any of those exceptions could ever apply to the sort of search and seizure involved in this case. Even electronic surveillance substantially contemporaneous with an individual's arrest could hardly be deemed an 'incident' of that arrest.[20] Nor could the use of

"20. In Agnello v. United States, 269 U.S. 20, 30 [46 S.Ct. 4, 5, 70 L.Ed. 145], the Court stated: 'The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and oth-

er things to effect an escape from custody, is not to be doubted.'
Whatever one's view of 'the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest,' United States v. Rabinowitz, 339 U.S. 56, 61 [70 S.Ct. 430, 433, 94 L.Ed. 653]; *cf. id.*, at 71–79 [70 S.Ct. at 437–441] (dissenting opinion of Mr. Justice Frankfurter), the concept of an 'incidental' search cannot readily be extended to include surreptitious surveillance of an individual either immediately before, or immediately after, his arrest.

electronic surveillance without prior authorization be justified on grounds of 'hot pursuit.'[21] And, of course, the

"21. Although '[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others,' Warden v. Hayden, 387 U.S. 294, 298–299 [87 S.Ct. 1642, 1646, 18 L.Ed.2d 782], there seems little likelihood that electronic surveillance would be a realistic possibility in a situation so fraught with urgency.

very nature of electronic surveillance precludes its use pursuant to the suspect's consent.[22]

"22. A search to which an individual consents meets Fourth Amendment requirements, Zap v. United States, 328 U.S. 624 [66 S.Ct. 1277, 90 L.Ed. 1477], but of course 'the usefulness of electronic surveillance depends on lack of notice to the suspect.' Lopez v. United States, 373 U.S. 427, 463 [83 S.Ct. 1381, 1401, 10 L.Ed.2d 462] (dissenting opinion of Mr. Justice Brennan)."

Katz v. United States, 389 U.S. 347, 356–358, 88 S.Ct. 507, 514–515 (1967). (Footnotes in quotation.)

These cases and the requirement of judicial review just quoted represent settled law which the government does not dispute as generally applicable. It is, as we have noted, however, the government's position that in "national security" cases the President of the United States, in his capacity as Chief Executive, has unique powers of the "sovereign" which serve to exempt him and his agents from the judicial review restrictions of the Fourth Amendment.

## THE PRESIDENTIAL POWER

The sweep of the assertion of the Presidential power is both eloquent and breathtaking. In the memorandum of law filed with its petition, the government asserts:

"The President, in his dual role as Commander-in-Chief of the armed forces and Chief Executive, possesses another serious power and responsibility—that of safeguarding the security of the nation against those who would subvert the Government by unlawful means. *This power is the historical power of the sovereign to preserve itself.*" (Emphasis added.)

In a supplemental memorandum, the claim is somewhat broadened:

"The power at issue in this case is the inherent power of the President to safeguard the security of the nation."

We find in the government's brief no suggestion of limitations on such power, nor, indeed, any recognition that the sovereign power of this nation is by Constitution distributed among three coordinate branches of government.

While the government briefs do not identify them, there are important constitutional grants of power to the President of the United States. We find these express powers of the President of the United States set forth in the Constitution which are arguably relevant to this case:

"The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows * * *." U.S.Const. art. II, § 1.

\* \* \* \* \* \*

"The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment.

"He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S.Const. art. II, § 2.

\* \* \* \* \* \*

" \* \* \* he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States." U.S.Const. art. II, § 3.

■ No express grant of power to the President to make searches and seizures without regard to the Fourth Amendment may be found in these constitutional provisions. As we have noted, the government cites no constitutional language to support its position, but it does cite some case law.

Decision of six of the cases relied upon is based upon the war powers or foreign relations powers of the presidency —Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319–320, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Cafeteria and Restaurant Workers Union, Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 890, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); United States v. Pink, 315

U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875). None of these cases are criminal cases. None of them involve the Fourth Amendment. None of them involved wiretapping. These cases we deem totally inapplicable to the instant case where the Attorney General has certified that we deal with a domestic security problem.

Generally concerning presidential power in domestic affairs the government cites two other civil cases. In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L. Ed. 1092 (1895); Marbury v. Madison, 1 Cranch (5 U.S.), 137, 2 L.Ed. 60 (1803).

The *Debs* case was a petition for writ of habeas corpus. It dealt with contempt of court sentences meted out by a federal court for violation of an injunction issued during the Pullman Car strike of 1894. The opinion upheld the jurisdiction of the court which issued the injunction and entered the contempt sentences.[3] The opinion does contain dictum which described broad powers on the part of "the national government" to employ force to "brush away" obstructions to interstate commerce and to the mails. The instant case has no relation to interstate commerce or the United States mails. And the *Debs* case can hardly be read as authority for ignoring judicial processes.

As to Marbury v. Madison, *supra*, the government's citation seems to us to be questionable from its point of view. The case does deal with presidential power vis-a-vis the Constitution. But it is also Chief Justice Marshall's ringing affirmation of the supremacy of the Constitution over all three branches of government and of the authority and obligation of the Supreme Court of the United States to make binding interpretations of that document. We shall quote from Justice Marshall's language in the last section of this opinion.

As for In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), we thank the government for calling to our attention this fascinating story of the problems of the judiciary in an earlier day. But the holding that the President has a right under Article II, § 3 to appoint a Deputy Marshal to protect the threatened life of a Supreme Court Justice is hardly precedent for this case.

The government also cites Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). This case involved a prosecution for espionage against the most important foreign spy known to the American public in the Twentieth Century. He was an alien and, hence, subject to statutory regulations providing for administrative procedures for deportation for violations of the laws and regulations of the United States. He was arrested by warrant, which the opinion of the Court found to have been lawfully issued by a lawfully authorized magistrate, and the materials seized at the time of his arrest were held legally admissible as incident to that arrest. *Cf.* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Although there were issues in this case which divided the Court 5–4, it cannot appropriately be cited as precedent for seizure without warrant of wiretap materials in domestic security problems.

Finally, the government relies upon the fact that there are certain established exceptions to the requirement of a prior judicial warrant for a search. *See* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). None of these cases, however, were wiretap cases. All involved emergency situations which were held to prevent obtaining or excuse absence of a prior warrant. And in all instances there was submission of evidence for subsequent judicial review.

---

**3.** *But see* Norris-LaGuardia [Anti-Injunction] Act, 29 U.S.C. §§ 101–115 (1964).

The point at which the claim of broad inherent power of the presidency in domestic affairs actually came to decision is found in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). There President Truman's seizure of the steel mills to avoid a nationwide steel strike was defended as within his inherent power as Chief Executive charged with seeing that the laws are "faithfully executed." The Supreme Court squarely rejected the inherent power doctrine in an opinion by Mr. Justice Black, from which we quote the controlling language:

"It is clear that if the President had authority to issue the order he did, it must be found in some provisions of the Constitution. And it is not claimed that express constitutional language grants this power to the President. The contention is that presidential power should be implied from the aggregate of his powers under the Constitution. Particular reliance is placed on provisions in Article II which say that 'The executive Power shall be vested in a President * * *'; that 'he shall take Care that the Laws be faithfully executed'; and that he 'shall be Commander in Chief of the Army and Navy of the United States.'

"The order cannot properly be sustained as an exercise of the President's military power as Commander in Chief of the Armed Forces. The Government attempts to do so by citing a number of cases upholding broad powers in military commanders engaged in day-to-day fighting in a theater of war. Such cases need not concern us here. Even though 'theater of war' be an expanding concept, we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities.

"Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States * * *.' After granting many powers to the Congress, Article I goes on to provide that Congress may 'make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.'

"The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President. The preamble of the order itself, like that of many statutes, sets out reasons why the President believes certain policies should be adopted, proclaims these policies as rules of conduct to be followed, and again, like a statute, authorizes a government official to promulgate additional rules and regulations consistent with the policy proclaimed and needed to carry that policy into execution. The power of Congress to adopt such public policies as those proclaimed by the order is beyond question. It can authorize the taking of private property for public use. It can make laws regulating the relationships between employers and employees, prescribing rules designed to settle labor disputes, and fixing

wages and working conditions in certain fields of our economy. The Constitution does not subject this lawmaking power of Congress to presidential or military supervision or control.

"It is said that other Presidents without congressional authority have taken possession of private business enterprises in order to settle labor disputes. But even if this be true, Congress has not thereby lost its exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution 'in the Government of the United States, or any Department or Officer thereof.'

"The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice. Such a review would but confirm our holding that this seizure order cannot stand." Youngstown Sheet & Tube Co. v. Sawyer, *supra* at 587–589, 72 S.Ct. at 866.

The *Youngstown* case, of course, had nothing to do with wiretaps. But it is the authoritative case dealing with the inherent powers of the Presidency—a doctrine which is strongly relied upon by the government in this case.

### THE WIRETAP ISSUE IN THE SUPREME COURT

Historically there have been four positions stated on the legality of wiretapping or the admissibility of evidence derived therefrom.

1. In its first encounter with the problem, the United States Supreme Court simply decided that since there was no trespass involved in the wiretap there concerned, it was therefore not a search and seizure and the Fourth Amendment did not apply to it. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

2. In *Olmstead* Justice Brandeis in dissent (joined by Justice Holmes, who called wiretapping a "dirty business") staked out a position which has many adherents today. This position is that wiretapping represented an unfair invasion of privacy which the government should not undertake under any circumstance.

3. The third position, one which the Supreme Court came to gradually,[4] is now the dominant one in our law and best expressed in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Supreme Court now clearly regards the protection of the Fourth Amendment to be one afforded to the right of privacy rather than to property. In *Katz* and its progeny (discussed and cited above) the Supreme Court specifically held that wiretapping which did not invade property rights was nonetheless governed by the restrictions of the Fourth Amendment.

4. The fourth position is the one just set forth in the preceding section of this opinion wherein the Attorney General and his representatives claim special powers for the presidency and for law enforcement officials acting with the authorization of the Attorney General to wiretap in "national security cases." The argument for this power is best exemplified by articles by former Attorney General Brownell and former Deputy Attorney General Rogers. Brownell, The Public Security and Wire Tapping, 39 Cornell L.Q. 195 (1954); Rogers, The Case for Wire Tapping, 63 Yale L.J. 792 (1954). This position is also expli-

4. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

cated in memoranda exchanged between three former Presidents of the United States and their Attorneys General commanding or authorizing them to make greater or lesser use of this asserted Presidential power. *See* Appendix A.

It appears to us that this fourth position could (and perhaps should) be further subdivided as between foreign and domestic applications. (Note that the American Bar Association has recently adopted a similar position. ABA Standards For Electronic Surveillance, 8 Crim. L.Rep. 3097 (Feb. 17, 1971); ABA Delegates Approve Electronic Eavesdropping Standards, Reports and Proposals, 8 Crim.L.Rep. 2371 (Feb. 17, 1971)). But it is clear that in neither event has the specific power thus asserted ever been the subject of adjudication in the United States Supreme Court. In fact, in footnote 23 in the *Katz* case, Mr. Justice Stewart, writing for the Court, expressly reserved decision thereon:

> "23. Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case." Katz v. United States, *supra* at 358 n. 23, 88 S.Ct. at 515.

Even more recently in a foreign intelligence wiretap context, the Supreme Court had this issue presented on application for writ of certiorari. It denied the writ as applied to this issue. United States v. Clay, 430 F.2d 165 (5th Cir. 1970), cert. granted, limited to question 4, 400 U.S. 990, 91 S.Ct. 457, 27 L.Ed.2d 438 (1971).

From what has been said, it is clear that as far as the Appellate Courts are concerned, we write upon a clean slate.

### CONGRESSIONAL ACTION

The wiretap problem has also been the subject of great concern in the Legislative Branch of government. Early in the history of the wiretap controversy, and with little debate, Congress enacted § 605, which says in part:

> "no person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person; * * *." 47 U.S.C. § 605 (Supp. V, 1965–69).

Section 605 played some role in the development of the Supreme Court case law. But its language (forbidding interception *and* divulgence in describing the offense) failed to establish a decisive policy. Private wiretappers, many of them criminal, had every interest in not divulging. And successive Attorneys General took the statute as a license to wiretap so long as their agents did not divulge. See Brownell, The Public Security and Wire Tapping, 39 Cornell L.Q. 195 (1954); Rogers, The Case for Wire Tapping, 63 Yale L.J. 792 (1954).

The Omnibus Crime Control & Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (Supp. V, 1965–69), was, however, a very different matter. It followed the Supreme Court decision in Katz v. United States, *supra* in point of time. In many respects it followed *Katz* in content.

For our purposes the important sections of the bill are those which set out search warrant application procedures, those which allow an emergency exception from those procedures for 48 hours, and those which indicate that Congress was not seeking to restrict whatever constitutional power the President possessed in this field.

"(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of—

"(a) any offense punishable by death or by imprisonment for more than one year under sections 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to espionage), chapter 105 (relating to sabotage), chapter 115 (relating to treason), or chapter 102 (relating to riots);

"(b) a violation of section 186 or section 501(c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

"(c) any offense which is punishable under the following sections of this title: section 201 (bribery of public officials and witnesses), section 224 (bribery in sporting contests), section 1084 (transmission of wagering information), section 1503 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1751 (Presidential assassinations, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprizes), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), section 659 (theft from interstate shipment), section 664 (embezzlement from pension and welfare funds), or sections 2314 and 2315 (interstate transportation of stolen property);

"(d) any offense involving counterfeiting punishable under section 471, 472, or 473 of this title;

"(e) any offense involving bankruptcy fraud or the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States;

"(f) any offense including extortionate credit transactions under sections 892, 893, or 894 of this title; or

"(g) any conspiracy to commit any of the foregoing offenses." 18 U.S. C. § 2516(1) (a–g) (Supp. V, 1965–69).

"(7) Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that—

"(a) an emergency situation exists with respect to conspiratorial activities threatening the national security interest or to conspiratorial activities characteristic of organized crime that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, and

"(b) there are grounds upon which an order could be entered under this chapter to authorize such interception.

may intercept such wire or oral communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained in violation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application." 18 U.S.C. § 2518(7) (Supp. V, 1965–69).

"(3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power." 18 U.S.C. § 2511 (3) (Supp. V, 1965–69).

■ Without now passing specifically upon any of the more controversial aspects of this legislation, we view the wiretap provisions of the Omnibus Crime Bill as a general recognition by Congress that the Fourth Amendment does mandate judicial review of proposed searches and seizures of oral communications by wire. In addition, in § 2518(7) (a) Congress provided a statutory remedy for the exact sort of "national Security" problem which is presented by this case. It is obvious, however, that the Attorney General chose not to employ it.

■ While the government appears to rely heavily upon 18 U.S.C. § 2511(3), the language chosen by Congress, "Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President * * * " is not the language used for a grant of power. On the contrary, it was in our opinion clearly designed to place Congress in a completely neutral position in the very controversy with which this case is concerned.

## HOLDING

During more difficult times for the Republic than these, Benjamin Franklin said:

"They that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety." [5]

■ It is the historic role of the Judiciary to see that in periods of crisis, when the challenge to constitutional freedoms is the greatest, the Constitution of the United States remains the supreme law of our land. No one proclaimed this message with more force than did one of the first and one of the greatest Chief Justices of the United States. In Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), Chief Justice Marshall spoke on constitutional supremacy:

"That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected. The exercise of this original right is a very great exertion; nor can it nor ought it to be frequently repeated. The principles, therefore, so established are deemed fundamental. And as the authority, from which they proceed, is supreme, and can seldom act, they are designed to be permanent.

"This original and supreme will organizes the government, and assigns to different departments their respective powers. It may either stop here; or establish certain limits not to be transcended by those departments.

---

5. Historical Review of Pennsylvania cited in J. Bartlett, Bartlett's Familiar Quotations 227 (C. Morley & L. Everett ed. 1951).

\* \* \* \* \* \*

"Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature repugnant to the constitution is void.

"This theory is essentially attached to a written constitution, and is consequently to be considered by this court as one of the fundamental principles of our society." Marbury v. Madison, *supra* at 176.

In the same opinion Chief Justice Marshall outlined the function of the courts in interpreting the Constitution:

"It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

"So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or comformably to the constitution disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

"If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.

"Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.

"This doctrine would subvert the very foundation of all written constitu-

tions." Marbury v. Madison, *supra* at 177.

The government has not pointed to, and we do not find, one written phrase in the Constitution, in the statutory law, or in the case law of the United States, which exempts the President, the Attorney General, or federal law enforcement from the restrictions of the Fourth Amendment in the case at hand. It is clear to us that Congress in the Omnibus Crime Control & Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (Supp. V, 1965–69), refrained from attempting to convey to the President any power which he did not already possess.

■ Essentially, the government rests its case upon the inherent powers of the President as Chief of State to defend the existence of the State. We have already shown that this very claim was rejected by the Supreme Court in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed 1153 (1952), and we shall not repeat its holding here.

■ An additional difficulty with the inherent power argument in the context of this case is that the Fourth Amendment was adopted in the immediate aftermath of abusive searches and seizures directed against American colonists under the sovereign and inherent powers of King George III. The United States Constitution was adopted to provide a check upon "sovereign" power. The creation of three coordinate branches of government by that Constitution was designed to require sharing in the administration of that awesome power.

It is strange, indeed, that in this case the traditional power of sovereigns like King George III should be invoked on behalf of an American President to defeat one of the fundamental freedoms for which the founders of this country overthrew King George's reign.

The argument for unrestricted employment of Presidential power to wiretap is basically an argument *in terrorem*. It suggests that constitutional government is too weak to survive in a difficult world

and urges worried judges and worried citizens to return to acceptance of the security of "sovereign" power. We are earnestly urged to believe that the awesome power sought for the Attorney General will always be used with discretion.

Obviously, even in very recent days, as we shall see, this has not always been the case. And the history of English-speaking peoples (to say nothing of others) is replete with answers. *See e.. g.,* Entick v. Carrington, 19 How.St.Tr. 1029 (1765). In Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed. 2d 1127 (1961), the opinion for the United States Supreme Court summarized the long history of the English striving for freedom of expression and press and noted:

"Historically the struggle for freedom of speech and press in England was bound up with the issue of the scope of the search and seizure power." *Marcus v. Search Warrant, supra* at 724, 81 S.Ct. at 1712.

The Court also pointed out that as early as the 1760's Lord Camden had denounced a " 'discretionary power given to messengers to search wherever their suspicions may chance to fall. If such a power is truly invested in a secretary of state, and he can delegate this power, it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject.' Id., 1167 [Wilkes v. Wood, 19 How.St.Tr. 1153]." *Marcus v. Search Warrant, supra* at 729, 81 S.Ct. at 1714.

The Court's opinion concluded:

"This history was, of course, part of the intellectual matrix within which our own constitutional fabric was shaped. The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression. For the serious hazard of suppression of innocent expression inhered in the discretion confided in the officers authorized to exercise the power." Id. at 729, 81 S.Ct. at 1715.

That which has distinguished the United States of America in the history of the world has been its constitutional protection of individual liberty. It is this which has created the wonderful diversity of this great country and its many and varied opportunities. It is this which has created Justice Holmes' free marketplace of ideas from which have come our most signal advances in scientific and technological achievement and in social progress. Beyond doubt the First Amendment is the cornerstone of American freedom; The Fourth Amendment stands as guardian of the First.

■ Of course, it should be noted that the Fourth Amendment's judicial review requirements do not prohibit the President from defending the existence of the state. Nor does the Fourth Amendment require that law enforcement officials be deprived of electronic surveillance. What the Fourth Amendment does is to establish the method they must follow.

If, as the government asserts, following that method poses security problems (because an indiscrete or corruptible judge or court employee might betray the proposed investigation), then surely the answer is to take steps to refine the method and eliminate the problems. No one could be in better position to help the courts accomplish this goal than the Attorney General.

If there be a need for increased security in the presentation of certain applications for search warrant in the federal court, these are administrative problems amenable to solution through the Chief Justice of the United States and the United States Judicial Conference and its affiliated judicial organizations. The inclination of the judiciary to meet the practical problems of enforcement in this area is evidenced in the specific holding of this court and the United States Supreme Court in United States v. Osborn, 350 F.2d 497 (6th Cir. 1965), aff'd, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), and in the dictum in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), upon which the

search warrant terms of the Omnibus Crime Control & Safe Streets Act § 2516 were largely based. Congress clearly conceived situations so delicate that, for example, the Attorney General might seek his warrant for a search from the Chief Judge of the appropriate United States Court of Appeals. 18 U.S.C. § 2510 (Supp. V, 1965–69). So do we. But what we cannot conceive is that in the midst of the turmoil of the present day, the courts of the United States should suspend an important principle of the Constitution. The very nature of our government requires us to defend our nation with the tools which a free society has created and proclaimed and which, indeed, are justification for its existence.

▇▇▇ We hold that in dealing with the threat of domestic subversion, the Executive Branch of our government, including the Attorney General and the law enforcement agents of the United States, is subject to the limitations of the Fourth Amendment to the Constitution when undertaking searches and seizures for oral communications by wire.

We seek to be equally explicit about what we do not decide in this case:

1) We do not decide what the President of the United States can or cannot lawfully do under his constitutional powers as Commander-in-Chief of the Army and Navy to defend this country from attack, espionage or sabotage by forces or agents of a foreign power. As we have noted, the certificate filed by the Attorney General in this case makes no reference to and claims no reliance upon any such authority.

2) We do not decide whether or not there were facts available to the Attorney General in this case which might have constituted probable cause for issuance of a prior warrant for the wiretaps under 18 U.S.C. § 2516 (Supp. V, 1965–69), or a subsequent warrant (within 48 hours) as provided for by 18 U.S.C. § 2518(7) (Supp. V, 1965–69). This record indicates plainly that no such applications were made. Indeed, this record is devoid of any showing that any presentation of information under oath was ever made before, or any probable cause findings were ever entered by any administrative official—let alone any judge.

In our view, the *Clay* case (United States v. Clay, 430 F.2d 165 (5th Cir. 1970), cert. granted, limited to question 4, 400 U.S. 990, 91 S.Ct. 457, 27 L.Ed.2d 438 (1971)) cannot appropriately be read as authority for warrantless wiretaps in domestic security cases. In that case the government did not contest the illegality of four separate domestic wiretaps made under the same inherent powers relied on in this case. The transcripts of defendant Clay's intercepted conversations were turned over to him by the Department of Justice. In one such instance the illegal wiretap was upon the telephone of the Rev. Martin Luther King, Jr. One wonders, if the inherent powers of the Presidency were broad enough to authorize the wiretaps in the first instance, how these wiretaps became concededly unconstitutional in court.

As to the "fifth" wiretap disclosed in the *Clay* case, the Attorney General's certificate said that it was "for the purpose of gathering foreign intelligence information." The Fifth Circuit did squarely hold that such foreign intelligence surveillance without judicial warrant was not a constitutional violation. This was the second issue on which certiorari was sought from the Supreme Court, but, as we have noted, the Supreme Court refused certiorari on this issue while granting certiorari on another unrelated matter.

In the case before us, however, the Attorney General's certificate makes clear that the wiretaps involved were thought to be warranted by domestic security problems. We have noted the special constitutional powers of the Presidency in foreign affairs which the Fifth Circuit thought justified his "gathering foreign intelligence information" without judicial warrant. Without passing on that issue, we reiterate that we have found no such specific constitutional authority to dis-

regard the Fourth Amendment in domestic security cases like this one.

The last issue argued (this one by the government) concerns the order of disclosure of the overheard conversations. In effect the government contends that even though the District Judge found the interceptions to have been illegal, he should have determined *in camera* that they were not relevant to this case, and hence, not subject to disclosure. This very issue has been recently decided by the United States Supreme Court in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). In this case the opinion of the Court said:

> "An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case.

> \* \* \* \* \* \*

> "[I]f the hearings are to be more than a formality and petitioners not left entirely to reliance on government testimony, there should be turned over to them the records of those overheard conversations which the Government was not entitled to use in building its case against them." Alderman v. United States, *supra* at 182–183, 89 S.Ct. at 971 (Footnotes omitted.)

In a subsequent but closely related case, the Supreme Court applied *Alderman* as giving the District Court *in camera* the right and duty to screen government files for the illegally intercepted conversations of a defendant and held unanimously:

> "Here the defendant was entitled to see a transcript of his own conversations and nothing else. He had no right to rummage in government files." Taglianetti v. United States, 394 U.S. 316, 317, 89 S.Ct. 1099, 1101, 22 L.Ed. 2d 302 (1968).

Thus the Supreme Court held that all illegally intercepted conversations of a defendant must be made available to him, but that the District Judge may *in camera* ascertain which transcripts are covered by this ruling. Of course, in this case we have no problem concerning standing. The government concedes that Plamondon's own voice was intercepted and recorded and the District Judge and this court have held the interception to have been illegal.

We cannot agree with the dissent that Justice Stewart's concurring opinion in Giordano v. United States, 394 U.S. 310, 313–315, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), in any way weakened the disclosure requirement of *Alderman*. The full text of Justice Stewart's opinion makes it clear that the "preliminary determination" with which he was concerned was whether or not "any of the surveillances *did* violate the Fourth Amendment." This determination Justice Stewart held could be made by *in camera* inspection—as has been done in this case both by the District Judge and this court.

 We believe that the Supreme Court has held that a defendant whose personal conversations have been illegally recorded is entitled to transcripts of the illegally recorded material without regard to whether a judge on inspection *in camera* might or might not be able to find relevancy. Nonetheless, we have considered remand of this case to the District Judge for an expression on the relevancy issue so as to have a complete appellate record. On inspection of the sealed exhibit in this case, however, we cannot (and we do not believe the District Judge could) ascertain with any certainty whether or not the government

had derived prosecutorial benefits from this illegal search to which benefits defendant would have the right to object at trial under the doctrine of the "fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The dissent in this case makes this comment upon the sealed exhibit:

"The sealed exhibit, which contained only a few pages, was examined more than once by the members of this panel. The monitored conversations took place *subsequent* to the bombing and *after* the conspiracy alleged in the indictment had terminated. They did not relate in any way either to the conspiracy or to the substantive offense charged in the indictment, and would not be relevant or admissible at the trial; nor did they lead to any relevant and admissible evidence."

If this paragraph be read as carefully as it has been written, we have no reason to disagree. With all respect, however, we think two other facts need to be added before conclusions are drawn. First, the illegal interceptions occurred well before the indictments in this case were returned, and thus they could have been employed in the investigation which led to the indictments. Second, we have no way of knowing whether or not the government's investigation was materially aided by associations or leads developed from these conversations, regardless of whether or not the statement providing the lead appears on its face to be "admissible at the trial."

These considerations, of course, primarily affect this trial. Far more important, however, is the fact that disclosure may well prove to be the only effective protection against illegal wiretapping available to defend the Fourth Amendment rights of the American public.

For these reasons, we hold that the District Judge properly found that the conversations of defendant Plamondon were illegally intercepted, and we cannot hold that his disclosure order (as interpreted below) is an abuse of judicial discretion.

In perhaps an excess of caution, we note that we read the District Judge's disclosure order as limited solely to the transcripts and dates of defendant Plamondon's illegally intercepted telephone conversations. (*See* Taglianetti v. United States, *supra*).[6]

The petition for writ of mandamus is denied.

## APPENDIX A

### THE WHITE HOUSE WASHINGTON

CONFIDENTIAL May 21, 1940

MEMORANDUM FOR

### THE ATTORNEY GENERAL

I have agreed with the broad purpose of the Supreme Court decision relating to wire-tapping in investigations. The Court is undoubtedly sound both in regard to the use of evidence secured over tapped wires in the prosecution of citizens in criminal cases; and is also right in its opinion that under ordinary and normal circumstances wire-tapping by Government agents should not be carried on for the excellent reason that it is almost bound to lead to abuse of civil rights.

However, I am convinced that the Supreme Court never intended any dictum in the particular case which it decided to apply to grave matters involving the defense of the nation.

It is, of course, well known that certain other nations have been engaged in the organization of propaganda of so-called "fifth columns" in other countries and in preparation for sabotage, as well as in actual sabotage.

---

6. In the unlikely event that this interpretation of the District Judge's order proves erroneous, the government may seek relief from any broader order by filing a motion under Rule 40, Fed.R. App.P.

It is too late to do anything about it after sabotage, assassinations and "fifth column" activities are completed.

You are, therefore, authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigation agents that they are at liberty to secure information by listening devices direct to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies. You are requested furthermore to limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens.

(s) F. D. R.

### OFFICE OF THE ATTORNEY GENERAL WASHINGTON, D. C.

July 17, 1946.*

The President,
The White House.

My dear Mr. President:—

Under date of May 21, 1940, President Franklin D. Roosevelt, in a memorandum addressed to Attorney General Jackson, stated:

> "You are therefore authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigating agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies."

This directive was followed by Attorneys General Jackson and Biddle, and is being followed currently in this Department. I consider it appropriate, however, to bring the subject to your attention at this time.

It seems to me that in the present troubled period in international affairs, accompanied as it is by an increase in subversive activity here at home, it is as necessary as it was in 1940 to take the investigative measures referred to in President Roosevelt's memorandum. At the same time, the country is threatened by a very substantial increase in crime. While I am reluctant to suggest any use whatever of these special investigative measures in domestic cases, it seems to me imperative to use them in cases vitally affecting the domestic security, or where human life is in jeopardy.

As so modified, I believe the outstanding directive should be continued in force. If you concur in this policy, I should appreciate it if you would so indicate at the foot of this letter.

In my opinion, the measures proposed are within the authority of law, and I have in the files of the Department materials indicating to me that my two most recent predecessors as Attorney General would concur in this view.

Respectfully yours,

/s/ TOM C. CLARK
Attorney General.

July 17, 1947*
I concur.

/s/ HARRY S. TRUMAN

### ADMINISTRATIVELY CONFIDENTIAL

### THE WHITE HOUSE WASHINGTON

June 30, 1965.

### MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

I am strongly opposed to the interception of telephone conversations as a general investigative technique. I recognize that mechanical and electronic devices may sometimes be essential in protecting our national security. Nevertheless, it is clear that indiscriminate use of these investigative devices to overhear

* The possibly conflicting dates are quoted as set forth in the original document.

telephone conversations, without the knowledge or consent of any of the persons involved, could result in serious abuses and invasions of privacy. In my view, the invasion of privacy of communications is a highly offensive practice which should be engaged in only where the national security is at stake. To avoid any misunderstanding on this subject in the Federal Government, I am establishing the following basic guidelines to be followed by all government agencies:

(1) No federal personnel is to intercept telephone conversations within the United States by any mechanical or electronic device, without the consent of one of the parties involved. (except in connection with investigations related to the national security).

(2) No interception shall be undertaken or continued without first obtaining the approval of the Attorney General.

(3) All federal agencies shall immediately conform their practices and procedures to the provisions of this order.

Utilization of mechanical or electronic devices to overhear non-telephone conversations is an even more difficult problem, which raises substantial and unresolved questions of Constitutional interpretation. I desire that each agency conducting such investigations consult with the Attorney General to ascertain whether the agency's practices are fully in accord with the law and with a decent regard for the rights of others.

Every agency head shall submit to the Attorney General within 30 days a complete inventory of all mechanical and electronic equipment and devices used for or capable of intercepting telephone conversations. In addition, such reports shall contain a list of any interceptions currently authorized and the reasons for them.

/s/ LYNDON B. JOHNSON

WEICK, Circuit Judge (dissenting).

A two-count indictment was returned in the District Court charging the de-fendants, John Sinclair, Lawrence Robert "Pun" Plamondon, and John Waterhouse Forrest, in the first count with entering into a conspiracy commencing on or about September 1, 1968, and continuing thereafter up to and including November 1, 1968, to bomb by means of dynamite the offices of the Central Intelligence Agency, a facility of the United States Government, in Ann Arbor, Michigan. The second count of the indictment charged Plamondon alone with the substantive offense of damaging the facility on September 29, 1968 by dynamite, all in violation of 18 U.S.C. §§ 371 and 1361.

In its response to the motion filed by defendants for disclosure of the logs of the electronic surveillance, the Government attached an affidavit of the Attorney General stating positively that the wiretaps "were being employed to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government." He certified "that it would prejudice the national interest to disclose the particular facts concerning these surveillances other than to the Court in camera."

The District Judge, in his memorandum opinion, stated that the Government had submitted to him for *in camera* inspection a sealed exhibit containing the he made no finding that the conversations were relevant to any issue in the case or might lead to the discovery of any relevant and admissible evidence. He ordered the Government to produce the logs for inspection by the defendants. He further ordered an evidentiary hearing at the end of the trial to determine the existence of taint in the indictment or in the evidence. This last order would seem to indicate that in the opinion of the District Judge the logs contained no such disclosure.

The sealed exhibit, which contained logs of the monitored conversations but only a few pages, was examined more than once by the members of this panel. The monitored conversations took place *subsequent* to the bombing and *after* the

conspiracy alleged in the indictment had terminated. They did not relate in any way either to the conspiracy or to the substantive offense charged in the indictment, and would not be relevant or admissible at the trial; nor did they lead to any relevant and admissible evidence.

The surveillance was not directed at Plamondon, nor at any property owned or possessed by him. Disclosure of the dates and the monitored conversations, however, might furnish valuable information to the organization under surveillance as to the activities of the Government. The Government was of the view that a protective order would furnish no protection against disclosure. The Government sought to prevent disclosure by resisting the motion to produce, and in all probability will decline to comply with the order of the District Court, which would result in the dismissal of the indictment and the defendants would go free.

The fact that the interceptions took place before the indictments were returned is of no consequence. Since the interceptions contained no useful information relative to the conspiracy or bombing, they could not have assisted in the investigation.

In my opinion, the District Judge could not determine illegality by merely examining the logs. He conducted no evidentiary hearing but postponed it until the end of the trial. In my opinion he abused his discretion by ordering production of the logs.

The District Court interpreted Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), as requiring an adversary proceeding to determine illegality in every case of electronic surveillance, even though critical material may be involved and the issues in the criminal case are not complex. The majority opinion takes the same position. I read Alderman as requiring an adversary proceeding in that case, but not as specifying the procedure to be followed by a District Court in determining illegality.

In my opinion, the interpretation of the District Court ws erroneous. In decisions subequent to Alderman, the Supreme Court clarified any ambiguity which might theretofore have existed by holding that an adversary proceeding and full disclosure are not required for resolution of every issue raised by electronic surveillance. In Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, Mr. Justice Stewart, in a concurring opinion, stated:

"Moreover, we did not in *Alderman, Butenko,* or *Ivanov* and we do not today, specify the procedure that the District Courts are to follow in making this preliminary determination. We have nowhere indicated that this determination cannot appropriately be made in *ex parte, in camera* proceedings. 'Nothing in Alderman v. United States, Ivanov v. United States, or Butenko v. United States, *ante,* [394 U. S.] p. 165 [89 S.Ct. 961, 22 L.Ed.2d 176], requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance.' Taglianetti v. United States, *post,* [394 U.S.] p. 316 [89 S. Ct. 1099, 22 L.Ed.2d 302]." (394 U.S. at 314, 89 S.Ct. at 1165)

In my judgment, the Supreme Court in *Alderman* did not abolish nor intend to impair the traditional use of *in camera* proceedings which for so many years have been so efficacious in the protection of the rights of litigants. There may be cases involving a multitude of documents and complex issues where an adversary proceeding is required, but such is not the case here. The sealed exhibit contains very few sheets of paper. The issues were not complex. Only Plamondon was charged with the actual bombing on September 29, 1968, and he either did or did not do it.

The precise question was resolved in favor of the Government in United States v. Clay, 430 F.2d 165 (5th Cir. 1970), which involved five logs of electronic surveillance submitted to the District Court for *in camera* inspection. The Government did not challenge illegality with re-

spect to four of the logs, and they were turned over to the defendant. None of the four related in any manner to the charge in the indictment for violation of the Selective Service laws, and had no bearing on his conviction. The fifth log which "related to the gathering of foreign intelligence was held to be lawful surveillance, reasonable and necessary to the protection of the national interest."

The District Court in *Clay* determined this from an *in camera* inspection of the fifth log and an affidavit of the Attorney General, similar in form to his affidavit in the present case. The Court declined to turn over to the defendant the fifth log. The Court further determined from the *in camera* inspection and the hearing with respect to the other four logs that the defendant had failed to establish relevancy.

The Court of Appeals in *Clay* likewise examined the fifth log *in camera* and agreed with the District Court that the contents of the wiretap were not germane to any issue in the criminal prosecution and that the Court was correct in declining to order its production.

In an opinion written by Judge Ainsworth, the Court held:

"Under the circumstances here, publication of the fifth log to defendant is unwarranted and would be contrary to the national interest, having been obtained in foreign intelligence surveillance. The Court's in camera examination of the fifth log establishes to our satisfaction that the contents of the wiretap were not germane to any issue in this criminal prosecution and conviction. There has been no use against defendant of the information gained by the Government by the fifth wiretap and the information there obtained would not have been of assistance to the prosecutor in constructing a case against defendant. There is no indication that the information was or could be used in any way against defendant.

"Determination of this case requires that we balance the rights of the defendant and the national interest. The Attorney General, who acts here for the President and Commander-in-Chief, has submitted his affidavit that the fifth wiretap was maintained 'for the purpose of gathering foreign intelligence information' and the Attorney General opposed disclosure at the hearing because 'it would prejudice the national interest to disclose particular facts concerning this surveillance other than to the court.' The fifth log was submitted by the Government for an in camera examination by the Court, which has been made both here and in the District Court. The rights of defendant and the national interest have thus been properly safeguarded. Further judicial inquiry would be improper and should not occur. It would be 'intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.' Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). We, therefore, discern no constitutional prohibition against the fifth wiretap." (430 F.2d at 171)

The Supreme Court denied certiorari in *Clay* as to the fifth log (issue number 2 in the Supreme Court) and granted certiorari only on issue number 4 relating to the validity of Clay's claim to exemption from the draft as a conscientious objector. 400 U.S. 990, 91 S.Ct. 457, 27 L.Ed.2d 438.

In my opinion, the Supreme Court in declining to rule on the constitutional issue merely followed "the traditional practice of this Court of refusing to decide constitutional questions when the record discloses other grounds of decision, whether or not they have been properly raised before us by the parties." Neese v. Southern Ry., 350 U.S. 77, 78, 76 S.Ct. 131, 132, 100 L.Ed. 60 (1955).

In Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129, 136, 67 S.Ct. 231, 234, 91 L.Ed. 128 (1946), the Court said:

"This Court has said repeatedly that it ought not pass on the constitutional-

ity of an act of Congress unless such adjudication is unavoidable. This is true even though the question is properly presented by the record. If two questions are raised, one of non-constitutional and the other of constitutional nature, and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided."

The Court will wait on a concrete fact situation in order to avoid rendering a series of advisory opinions. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed. 2d 179 (1965), rehearing denied, 382 U.S. 873, 86 S.Ct. 17, 15 L.Ed.2d 114.

The District Court should have followed the procedure adopted in *Clay*. Had it done so, it would not have been necessary to rule on the constitutional issues in this case.

Rule 16 of the Federal Rules of Criminal Procedure relating to *pretrial discovery* permits discovery only of evidence which is *relevant* and *material*. The intercepted communications were neither relevant nor material. The rule does not authorize the order entered by the District Court in the present case.

In ruling that the President, acting through the Attorney General, was without constitutional power to utilize electronic surveillance to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government, the District Judge said:

"In this turbulent time of unrest, it is often difficult for the established and contented members of our society to tolerate, much less try to understand, the contemporary challenges to our existing form of Government. If democracy as we know it, and as our forefathers established it is to stand, then 'attempts of domestic organiza-

tions to attack and subvert the existing structure of the Government' (See affidavit of Attorney General), cannot be, in and of itself, a crime. It becomes criminal only where it can be shown that such activity was accomplished through unlawful means, such as invasion of the rights of others, namely through force or violence.

"The affidavit of the Attorney General of the United States makes no assertion that at the time these wiretaps were installed, law enforcement agents had probable cause to believe criminal activity (e. g. the illegal overthrow of the Government through force or violence) was being plotted. Indeed, if such probable cause did exist, a warrant to search may have properly been issued."

The established and contented members of our society are required to tolerate peaceful dissent even though they may find it difficult to understand at all times. But they are not required to tolerate, much less understand, plots of discontented members to overthrow the Government by force and violence.

In my opinion, it is the sworn duty of the President under the Constitution, as Commander-in-Chief of the Armed Forces and as Chief Executive, to protect and defend the nation from attempts of domestic subversives, as well as foreign enemies, to destroy it by force and violence. The risk of injury to the Government is just as great whether the attacks are from within or without, and domestic attacks may even be instigated, aided and abetted by a foreign power.

Attacks by domestic subversives and saboteurs may be even more dangerous than those of foreign sources, because of the difficulty of detection of "Fifth Column" activities.[1]

At a time when our soldiers are fighting on foreign soil and there is turbulence at home, thereby confronting the

---

1. 1096 bombings and 176 attempts were reported in the United States in 1970, against 549 bombings in 1969. 79 explosions were reported in January, 1971.

The latest bombing was the Capitol building in Washington. U. S. News & World Report, March 15, 1971.

President on two fronts, with many serious, perplexing and complex problems, there rests upon his shoulders a heavy responsibility to protect, not only the fighting men abroad, but also the people at home, from destruction of their Government by domestic subversives.

The legislative and judicial branches of the Government do not have the facilities to cope with the destruction of public buildings by saboteurs. Only the Executive Department of the Government has the facilities and know-how to deal with these intricate problems. When the Chief Executive deems it necessary to gather intelligence information for this purpose he ought not to be required first to make detailed explanations of classified information to a magistrate and procure his consent as a condition precedent to the exercise of his constitutional powers.[2]

Nor do I think that the Executive has to wait until "the activity of the subversives is accomplished through unlawful means, such as invasion of the rights of others through force and violence." It is too late to act after there has been a fait accompli.

As former Attorney General Brownell stated:

"It is of course too late to do anything about it after sabotage, assassinations and fifth column activities have been completed." The Public Security and Wiretapping, 39 Cornell Law Quarterly 205.

As well stated by Chief Justice Vinson in Dennis v. United States, 341 U.S. 494 at 509, 71 S.Ct. 857, 867, 95 L.Ed. 1137 (1951):

"Obviously, the words cannot mean that before the Government may act, it must wait until the *putsch* is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required."

In Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), the Court considered the powers of the President in foreign relations in an opinion delivered by Mr. Justice Jackson, stating:

"The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into executive confidences. But even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the do-

---

2. This would occasion delay and involve the possibility of leaks. To require the President of the United States to have probable cause before he can investigate spies, subversives, saboteurs, fifth columnists, and traitors would effectively frustrate and prevent any meaningful investigation of these persons.

If the President was in possession of facts establishing probable cause he might never need to investigate. Even the Secretary of Labor may investigate a labor union without having probable cause. Goldberg v. Truck Drivers Local Union No. 299, 293 F.2d 807 (6th Cir.), cert. denied, 368 U.S. 938, 82 S.Ct. 379, 7 L.Ed.2d 337 (1961).

main of political power not subject to judicial intrusion or inquiry." (333 U.S. at 111, 68 S.Ct. at 436)

See also Cafeteria and Restaurant Workers Union, Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 890, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319–320, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); In Re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875).

I see no reason why the powers of the President should be any different in dealing with either foreign or domestic subversives; both are equally harmful; both or either could result in the destruction of the Government.

Congress, in enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(3), provided exceptions to the warrant requirements of the Act, as follows:

"(3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power."

Referring to the exceptions, the Senate Report states:

"The only exceptions to the above prohibition are: (1) the power of the President to obtain information by such means as he may deem necessary to protect the Nation from attack or hostile acts of a foreign power, to obtain intelligence information essential to the Nation's security, and to protect the internal security of the United States from those who advocate its overthrow by force or other unlawful means." 1968 U.S.Code Cong. & Admin.News, p. 2153.

Sec. 2511(3) constitutes clear congressional recognition of the President's power to order electronic surveillance in national security cases.

The power of the President to order electronic surveillance in national security cases has been upheld in United States v. Clay, 430 F.2d 165 (5th Cir. 1970); United States v. Butenko, 318 F.Supp. 66 (D.N.J.1970); and United States v. Dellinger, Crim. No. 69–180, N.D.Ill., 1970. It was denied in United States v. Smith, 321 F.Supp. 424, C.D.Cal. 1970.

Mr. Justice White, concurring in Katz v. United States, 389 U.S. 347, at 363–364, 88 S.Ct. 507, 518, 19 L.Ed.2d 576 (1967), said:

"In joining the Court's opinion, I note the Court's acknowledgment that there are circumstances in which it is reasonable to search without a warrant. In this connection, in footnote 23 the Court points out that today's decision does not reach national security cases. Wiretapping to protect the security of the Nation has been authorized by successive Presidents. The present Administration would apparently save national security cases from

restrictions against wiretapping. See Berger v. New York, 388 U.S. 41, 112–118 [87 S.Ct. 1873, 1911–1914, 18 L. Ed.2d 1040] (1967) (White, J., dissenting). We should not require the warrant procedure and the magistrate's judgment if the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable."

Justices Douglas and Brennan expressed contrary views, 389 U.S. at 359–360, 88 S.Ct. 507. The Supreme Court has not decided the issue. Giordano v. United States, 394 U.S. 310, 314, 89 S.Ct. 1163, 22 L.Ed.2d 297.

I regard as inapposite the case of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), which involved seizure by the President of private property in order to prevent a strike which he thought would seriously affect the economy of the country. The protection of the Government against attacks designed to overthrow it by force and violence involves an entirely different matter.

In my opinion, the surveillance in the present case was reasonable.

It has been said that wiretapping is dirty business. Professor Wigmore answered this argument:

"But so is likely to be all apprehension of malefactors. Kicking a man in the stomach is 'dirty business' normally viewed, but if a gunman assails you and you know enough of the French art of savatage to kick him in the stomach and thus save your life, is that dirty business for you?" 8 Wigmore on Evidence § 2184(b), p. 50. Also 23 Ill.L.Rev. 377 (1928).

I agree that the remedy of mandamus is appropriate.

I would grant the writ and vacate the order of the District Court.