UNITED STATES of America,
Plaintiff,

v.

Melvin Carl SMITH, Defendant.

Cr. No. 4277–CD.

United States District Court,
C. D. California.

Jan. 8, 1971.

Robert L. Meyer, U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, Larry S. Flax, Asst. U. S. Atty., for plaintiff.

Jean Kidwell, Kidwell, Pestana & Smith, Michael Tigar, Professor of Law, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

Melvin Carl Smith was found guilty in this court of two counts involving unlawful possession of firearms in violation of 18 U.S.C., App. § 1202(a) (possession of a firearm by a person previously convicted of a felony). He was sentenced to two years in prison on each of the two counts, to begin and run consecutively. Defendant appealed his conviction on October 31, 1969.

While the appeal was pending, the government disclosed to the Court of Appeals that it had searched its files and discovered that the defendant had participated in conversations which were monitored by electronic surveillance conducted by the federal government to gather intelligence information relating to the national security. In light of this, the circuit court granted the government's motion for a limited remand to this court "for proceedings required by Alderman v. United States, 394 U.S. 165 [89 S.Ct. 961, 22 L.Ed.2d 176]".

The Supreme Court held, in *Alderman*, that "surveillance records as to which any [defendant] has standing to object should be turned over to him without being screened *in camera* by the trial judge". 394 U.S. at 182, 89 S.Ct. at 971. In a per curiam opinion, Giordano v.

United States, 394 U.S. 310, 313, 89 S. Ct. 1163, 1165, 22 L.Ed.2d 297 (1969), the Court further stated that "[o]f course, a finding by the District Court that the surveillance was lawful would make disclosure and further proceedings unnecessary".

Consistent with these Supreme Court guidelines, three separate determinations must be made in this case: (1) whether the defendant has standing to object; (2) whether the electronic surveillance is constitutionally proper; and (3) if it is determined that the surveillance was improper, whether the evidence against the defendant is "tainted".

■ Since the defendant was a party to the monitored conversations, it is conceded that he has standing to raise an objection. 394 U.S. at 176, 89 S.Ct. 961, 22 L.Ed.2d 176. The second issue is whether the maintenance of the electronic surveillance violated the defendant's Fourth Amendment rights. Disclosure is required only if the court determines that the surveillance was improper. Following an order of disclosure, there would be a full hearing to determine whether the evidence against the defendant at trial grew out of his illegally-overheard conversations. Of course, this recognizes that the government might "prefer dismissal of the case to disclosure of the information". 394 U.S. at 181, 89 S.Ct. at 971, 22 L.Ed.2d 176.

A threshold issue which has been raised by both sides is the relationship of the Omnibus Crime Control and Safe Streets Act of 1968 to the surveillance in question here. The government contends that the Act constitutes a congressional recognition of the authority it claims in the present case. The Act contains the statement that:

"Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power."

The major thrust of the relevant portion of this Act makes electronic eavesdropping a federal crime punishable by a fine of $10,000, or imprisonment of up to five years, or both. However, there are certain exceptions, and under these limited circumstances electronic eavesdropping is not a federal crime. The portion quoted above provides for one of these exceptions. Thus, the President does not commit a crime under this statute when he authorizes electronic surveillance "to obtain foreign intelligence information deemed essential to the security of the United States". Similarly, it provides that the President is exempt from the criminal sanctions of the Act when he takes "such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means".

■ Regardless of these exceptions in the criminal statute, the President is, of course, still subject to the constitutional limitations imposed upon him by the Fourth Amendment. Congress expressly recognized this when it stated that evidence resulting from such an electronic

surveillance could "be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable". Thus, the issue before this court is whether the electronic surveillance conducted by the government in this case is consistent with the constitutional requirements of the Fourth Amendment.

■ The government asserts that, in spite of the fact that a warrant was not obtained prior to instituting the surveillance, it was a constitutionally proper surveillance because the Attorney General of the United States expressly authorized it to gather "intelligence information deemed necessary to protect the nation from attempts of domestic organizations to use unlawful means to attack and subvert the existing structure of the government". The issue thus becomes whether the government can, consistent with constitutional standards, institute electronic surveillance without prior judicial authorization where it is authorized by the Attorney General in the interest of national security. The Supreme Court has expressly avoided ruling on this issue. Katz v. United States, 389 U.S. 347, 358 n. 23, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967); Giordano v. United States, 394 U.S. 310, 314, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (Justice Stewart concurring).

In his concurring opinion in *Katz*, Justice White expressed the view that the warrant procedure should not be required where the Attorney General has "considered the requirements of national security and authorized electronic surveillance as reasonable". 389 U.S. at 364, 88 S.Ct. at 518, 19 L.Ed.2d 576. Justice Douglas and Justice Brennan strongly disagreed, stating that there ought not to be such an exception. 389 U.S. at 359–360, 88 S.Ct. 507, 19 L.Ed.2d 576. Justice Black would presumably allow such surveillance, indeed all electronic surveillance, since he has consistently stated that "eavesdropping carried on by electronic means" does not constitute "a 'search' or 'seizure'", and thus is not within the purview of the Fourth Amendment. 389 U.S. at 364–374, 88 S.Ct. 507, 19 L.Ed.2d 576. In *Alderman,* Justice White suggested that in light of the disclosure requirement the government might have to dismiss certain cases "in deference to national security". This seems to suggest that he may have reconsidered his initial position, since under it national security cases would be almost *per se* lawful, and therefore not subject to the disclosure requirement.

The government asserts that the President, acting through the Attorney General, has the inherent constitutional power: (1) to authorize, without a judicial warrant, electronic surveillance in "national security" cases; and (2) to determine unilaterally whether a given situation is a matter within the concept of national security.

It should be noted that the government does not limit its assertion of this power to those cases involving foreign intelligence, *i. e.,* espionage and counter-espionage. Indeed, there is nothing in the present case which suggests that it is anything other than a purely domestic situation. It might very well be that warrantless surveillance of this type, while unconstitutional in the domestic situation, would be constitutional in the area of foreign affairs. This possible distinction is largely due to the President's long-recognized, inherent power with respect to foreign relations. See, *e. g.,* Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States v. Belmont, 301 U.S. 324, 328, 57 S.Ct. 758, 81 L.Ed. 1134 (1937).

This court makes no decision with regard to whether there might be such an exemption from the warrant requirement in security cases involving foreign relations. Nor does it determine whether this exception would apply only to the requirement of the actual warrant, or also to the warrant proceeding wherein it could be judicially determined whether the case in question fell into the exempted area.

The government's position is that the Fourth Amendment prohibits only "unreasonable" searches and seizures. Thus, the warrant provision is viewed as merely one possible means of insuring that the search is reasonable. With this basis the government then asserts that:

"Faced with such a state of affairs, any President who takes seriously his oath to 'preserve, protect and defend the Constitution' will no doubt determine that it is not 'unreasonable' to utilize electronic surveillance to gather intelligence information concerning those organizations which are committed to the use of illegal methods to bring about changes in our form of Government and which may be seeking to foment violent disorders." Gov't Br. at 7.

The difficulty with the government's position is that in this context "reasonableness" becomes solely a value judgment.

An interpretation of the Fourth Amendment very similar to the government's was adopted by the Supreme Court in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). However, the Court's decision in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), expressly overruled *Rabinowitz* insofar as the latter was inconsistent with it. The Court met the government's "reasonableness" argument head-on and concluded that "that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point". 395 U.S. at 764–765, 89 S.Ct. at 2041, 23 L.Ed.2d 685.

It is true, of course, that the warrant requirement is not absolute. Certain exceptions—stop and frisk, searches incident to arrest, searches of moving vehicles—have long been recognized. However, these exceptions are cautiously limited to certain very practical and clearly ascertained circumstances. First, an officer cannot, and should not, be prevented from making a self-protective search for weapons. Second, the officer should be allowed to act so as to prevent the destruction or concealment of evidence. 395 U.S. at 762–763, 89 S.Ct. 2034, 23 L.Ed.2d 685.

The government points out, as precedent for its position, that every President since Franklin D. Roosevelt has authorized electronic surveillance, without warrants, in national security cases. Historical analysis reveals that: (1) this practice grew out of presidential decisions based upon factors other than the Fourth Amendment, rather than judicial constitutional interpretation; and (2) the concept of the proposed national security exception has been drastically expanded since its initiation.

In the first Supreme Court case in this area, Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the Court held that the Fourth Amendment did not prohibit wiretapping without a warrant. This decision was based upon the rationale that conversations could not be "seized". This view is now advocated only by Justice Black. Shortly thereafter, Congress enacted Section 605 of the Federal Communications Act of 1934, 48 Stat. 1103, 47 U.S.C. § 605. The original Section 605 provided that:

"No person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person."

In Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), the Court held that Section 605 prohibited wiretapping by law enforcement officers for the purpose of procuring evidence.

Apparently, the Department of Justice viewed *Nardone* as only precluding divulgence, not wiretapping, and did not consider disclosure within the depart-

ment to be "divulgence". Brownell, The Public Security and Wire Tapping, 39 Cornell L.Q. 195, 197 (1954). The second *Nardone* case, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), involved information obtained from the wiretap, but no direct testimony concerning the content of the intercepted conversation. The Court held that any use of the improper interception was forbidden and again reversed the conviction.

Even after the second *Nardone* case, the Department of Justice continued, for a short time, to intercept and use the information for agency purposes. 39 Cornell L.Q. at 198. Then in 1940, Attorney General Jackson announced that the department would discontinue wiretapping. *Id.* at 199. Shortly thereafter, however, President Roosevelt sent a confidential memorandum to Attorney General Jackson authorizing him to utilize wiretaps in certain matters "involving the defense of the nation". *See* Appendix.

Even assuming that the Roosevelt directive was constitutionally proper, there are several characteristics which distinguish it from the instant situation: (1) Roosevelt conceded that under "normal circumstances wire-tapping by Government agents should not be carried on for the very excellent reason that it is almost bound to lead to abuse of civil rights". However, in response to the fact that other nations were engaged in "fifth column" activities as well as actual sabotage, Roosevelt felt such drastic action was justified; (2) Roosevelt expressly concurred in the Supreme Court's prohibition against the use of such wiretap evidence in criminal cases; (3) Roosevelt concluded with the admonishment "to limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens".

In somewhat expanding form this general authorization to wiretap has been continued by each successive President. *See* Appendix. However, it is clear that as late as 1954, the Department of Justice did not consider that the then existing law allowed the use of wiretap evidence in criminal cases even in espionage matters. Rogers, The Case for Wire Tapping, 63 Yale L.J. 792 (1954). In this article, then Deputy Attorney General Rogers wrote that:

> "[L]aw enforcement officers possessed of intercepted information vital to the security of the nation may not use such information in bringing spies and saboteurs to justice in our federal courts." *Id.* at 793.

Presumably, this was a statutory limitation rather than a constitutional one.

In *Katz*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court explicitly discarded reliance upon the property concept in search and seizure cases. Thus, for the first time, the Fourth Amendment constitutional limitations became fully applicable to electronic eavesdropping. The Court, as noted earlier, expressly reserved decision in the present type of case.

The government states that the decision to initiate surveillance in this type of case must be "based on a wide variety of considerations and on many pieces of information which cannot readily be presented to a magistrate". Gov't Br. at 8. This seems to be an attempt to invoke the "practicality" exception to the warrant procedure. In cases involving foreign affairs this argument might very well prevail.[*] In that situation, numerous non-judicial factors are relevant and the decision would probably be far removed from the consideration of probable cause. However, this argument is totally inapplicable in a criminal proceeding in a federal court involving a domestic situation.

It is at this point that the government's assertion of authority and our general concept of political freedom become most closely intertwined. The government has emphasized that the purpose of the surveillance involved was "not to gather evidence for use in a criminal prosecution but rather to provide intelligence information needed to protect against the illegal attacks of such organizations". Unlike in the area

of foreign affairs, in the area of domestic political activity the government can act only in limited ways. See, e. g., Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Due to the various constitutional guaranties protecting political freedom, the government can act only to prevent or punish *unlawful acts*. The government seems to concede this limitation in its brief when it states that it wishes to take action against "organizations which intend to use force and other *illegal* means", and "the *illegal* attacks of such organizations". (Emphasis added.)

However, the government seems to approach these dissident domestic organizations in the same fashion as it deals with unfriendly foreign powers. The government cannot act in this manner when only domestic political organizations are involved, even if those organizations espouse views which are inconsistent with our present form of government. To do so is to ride roughshod over numerous political freedoms which have long received constitutional protection. The government can, of course, investigate and prosecute criminal violations whenever these organizations, or rather their individual members, step over the line of political theory and general advocacy and commit illegal acts.

The warrant procedure basically requires the government to obtain a warrant, based upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. This, in effect, inserts the impartial judgment of a court between the citizen and the government. Since these cases properly involve the investigation of crime, the magistrate in a warrant proceeding in this type of case would be performing his normal function of determining the existence of probable cause.

The government's position presents two other peripheral problems which, while not determinative of the present case, deserve attention. The first involves the presidential delegation of the authority to authorize such warrantless searches. Since the sole basis for the delegation of this authority is a confidential memorandum from the President, what is to prevent him from delegating this power to persons other than the Attorney General? The government stated at oral argument that the President would not do this, but could give no reason why he could not do it.

The second issue is whether the exception to the warrant provision asserted here would apply to other types of searches and seizures involving similar national security interests. Electronic surveillance is perhaps the most objectionable of all types of searches in light of the intention of the Fourth Amendment. It is carried out against an unsuspecting individual in a dragnet fashion, taking in all of his conversations whether or not they are relevant to the purposes of the investigation and continuing over a considerable length of time. If the government's "reasonableness" rationale is accepted in this case, then it would apply *a fortiori* to other types of searches. Since they are more limited in time, place and manner, they would be even more "reasonable".

██ This court is forced to conclude that in wholly domestic situations there is no national security exemption from the warrant requirement of the Fourth Amendment. Since there is no reason why the government could not have complied with this requirement by obtaining the impartial judgment of a court before conducting the electronic surveillance in question here, it was obtained in violation of the Fourth Amendment. For this reason the court hereby orders the government to make full disclosure to the defendant of his monitored conversations.

There is one final point which this court must discuss. The government's brief states that "[t]here can be no question that the President *must and will* engage in intelligence gathering operations which he believes are necessary to protect the security of the nation". Gov't Br. at 3. (Emphasis added.) This statement suggests two problems.

The first involves the power of the court to prevent this type of warrantless electronic surveillance. It is true that the court has only limited power to prevent this type of behavior. Due to the limitations of the exclusionary rule, at the present time courts are, for practical purposes, powerless to prevent unconstitutional searches of any type, when there is no attempt to use information gained from that search in a subsequent court proceeding. However, the fact that there are only a very limited number of ways in which a court can act to prevent this type of action should not be the basis for refusing to find the conduct unconstitutional. In the present case, there has been a subsequent criminal proceeding and disclosure is a first step in the determination of whether tainted evidence which should have been excluded was used at the trial.

A second, and more difficult, problem is also suggested by the government's statement. Roughly stated, this is that the President cannot recognize judicially determined limitations on his power to act to protect the security of the nation. This dilemma is by no means a new one, and it was clearly in the minds of the framers of the Constitution.

> "It is in vain to oppose constitutional barriers to the impulse of self-preservation. It is worse than in vain; because it plants in the Constitution itself necessary usurpations of power, every precedent of which is a germ of unnecessary and multiplied repetitions." Madison, The Federalist, No. 41, p. 269. (Cooke ed. 1961.)

This is, no doubt, a valid consideration with regard to the President's power to take steps to protect the nation from foreign threats. However, limitations which are artificial in the international sphere, are reasonable and proper when solely domestic subversion is involved. In the domestic area, it is important to remember that there are numerous questions which cannot be answered by recognition of the importance of the national security. The Constitution, in response to the dilemma posed by Madison,

was written so as to strike a balance between the protection of political freedom and the protection of the national security interest. To guarantee political freedom, our forefathers agreed to take certain risks which are inherent in a free democracy. It is unthinkable that we should now be required to sacrifice those freedoms in order to defend them.

The court, therefore, finds that the electronic surveillance conducted in this case was constitutionally improper. The government is ordered to disclose fully to the defendant its surveillance records in order for the court and the parties to proceed with a hearing to determine whether or not evidence against the defendant was tainted.

It is further ordered that this directive shall be stayed for a period of 30 days, in order to grant the government time to perfect an appeal.

It is, therefore, ordered that the clerk this date shall serve copies of this memorandum opinion, by United States mail, upon the attorneys for the parties appearing in this action.

## APPENDIX

### THE WHITE HOUSE
### WASHINGTON

CONFIDENTIAL                May 21, 1940

MEMORANDUM FOR

### THE ATTORNEY GENERAL

I have agreed with the broad purpose of the Supreme Court decision relating to wire-tapping in investigations. The Court is undoubtedly sound both in regard to the use of evidence secured over tapped wires in the prosecution of citizens in criminal cases; and is also right in its opinion that under ordinary and normal circumstances wire-tapping by Government agents should not be carried on for the excellent reason that it is almost bound to lead to abuse of civil rights.

However, I am convinced that the Supreme Court never intended any dictum in the particular case which it decided to

apply to grave matters involving the defense of the nation.

It is, of course, well known that certain other nations have been engaged in the organization of propaganda of so-called "fifth columns" in other countries and in preparation for sabotage, as well as in actual sabotage.

It is too late to do anything about it after sabotage, assassinations and "fifth column" activities are completed.

You are, therefore, authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigation agents that they are at liberty to secure information by listening devices direct to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies. You are requested furthermore to limit these investigations so conducted to a minimum and to limit them insofar as possible to aliens.

·(s) F.D.R.

(SEAL)

OFFICE OF THE ATTORNEY GENERAL

WASHINGTON, D. C.

July 17, 1946.

The President,

The White House.

My dear Mr. President:

Under date of May 21, 1940, President Franklin D. Roosevelt, in a memorandum addressed to Attorney General Jackson, stated:

"You are therefore authorized and directed in such cases as you may approve, after investigation of the need in each case, to authorize the necessary investigating agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States, including suspected spies."

This directive was followed by Attorneys General Jackson and Biddle, and is being followed currently in this Department. I consider it appropriate, however, to bring the subject to your attention at this time.

It seems to me that in the present troubled period in international affairs, accompanied as it is by an increase in subversive activity here at home, it is as necessary as it was in 1940 to take the investigative measures referred to in President Roosevelt's memorandum. At the same time, the country is threatened by a very substantial increase in crime. While I am reluctant to suggest any use whatever of those special investigative measures in domestic cases, it seems to me imperative to use them in cases vitally affecting the domestic security, or where human life is in jeopardy.

As so modified, I believe the outstanding directive should be continued in force. If you concur in this policy, I should appreciate it if you would so indicate at the foot of this letter.

In my opinion, the measures proposed are within the authority of law, and I have in the files of the Department materials indicating to me that my two most recent predecessors as Attorney General would concur in this view.

Respectfully yours,

(S) Tom C. Clark

Attorney General

I concur July 17, 1947

(S) Harry S. Truman

ADMINISTRATIVELY CONFIDENTIAL

THE WHITE HOUSE

WASHINGTON

June 30, 1965

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

I am strongly opposed to the interception of telephone conversations as a general investigative technique. I recognize that mechanical and electronic devices

may sometimes be essential in protecting our national security. Nevertheless, it is clear that indiscriminate use of those investigative devices to overhear telephone conversations, without the knowledge or consent of any of the persons involved, could result in serious abuses and invasions of privacy. In my view, the invasion of privacy of communications is a highly offensive practice which should be engaged in only where the national security is at stake. To avoid any misunderstanding on this subject in the Federal Government, I am establishing the following basic guidelines to be followed by all government agencies:

(1) No federal personnel is to intercept telephone conversations within the United States by any mechanical or electronic device, without the consent of one of the parties involved, (except in connection with investigations related to the national security).

(2) No interception shall be undertaken or continued without first obtaining the approval of the Attorney General.

(3) All federal agencies shall immediately conform their practices and procedures to the provisions of this order.

Utilization of mechanical or electronic devices to overhear non-telephone conversations is an even more difficult problem, which raises substantial and unresolved questions of Constitutional interpretation. I desire that each agency conducting such investigations consult with the Attorney General to ascertain whether the agency's practices are fully in accord with the law and with a decent regard for the rights of others.

Every agency head shall submit to the Attorney General within 30 days a complete inventory of all mechanical and electronic equipment and devices used for or capable of intercepting telephone conversations. In addition, such reports shall contain a list of any interceptions currently authorized and the reasons for them.

(S) Lyndon B. Johnson