## Keith FORSYTH

v.

**Richard G. KLEINDIENST, Individually and as Attorney General of the United States, L. Patrick Gray, 3rd, Individually and as Acting Director, Federal Bureau of Investigation, John N. Mitchell, Individually and as former Attorney General of the United States, John Doe and Richard Roe.**

**Civ. A. No. 72–1920.**

United States District Court,
E. D. Pennsylvania.

Feb. 14, 1978.

David Rudovsky, Philadelphia, Pa., for plaintiff.

Gordon W. Daiger, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff, Keith Forsyth, initiated this civil action in 1972 to recover damages in connection with the federal government's electronic interception of telephone conversations, which he claims violated his rights under 18 U.S.C. §§ 2510–2520 and the First, Fourth and Ninth Amendments of the Constitution of the United States.[1] The defendants remaining in this action [2] are former Attorney General of the United States John Mitchell, who authorized the wiretap, and two Federal Bureau of Investigation employees, who intercepted the conversations. The plaintiff bases his cause of action upon the undisputed facts that the wiretap placed upon the telephone of William Davidon was warrantless and without court approval, and that during this surveillance, conversations of the plaintiff were overheard and recorded.[3] Discovery in this case has been completed, although at the defendants' request many of the documents and briefs have been filed with the Court *in camera*. Presently before the Court are cross-motions for summary judgment on the issue of liability. Having heard oral argument, we now determine that both these motions will be denied on the ground that there exists a genuine issue of material fact.

The defendants claim that they are entitled to summary judgment on the basis of the record for the following reasons:

1. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 is not applicable to national security electronic surveillances;

2. *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), should not be applied retroactively to give plaintiff a cause of action;

3. The defendants have an absolute immunity in this action for damages; and

1. The plaintiff had originally alleged a violation of his rights under 47 U.S.C. § 605, but now concedes that he has no cause of action thereunder. He has also agreed that the Sixth Amendment claim asserted in the complaint should be dismissed for failure of proof.

2. In his complaint the plaintiff had included as defendants former Attorney General Richard Kleindienst and former FBI Director L. Patrick Gray. He has admitted, however, that his claims against them should be dismissed.

3. The disclosure of this electronic surveillance was made by the United States in response to an 18 U.S.C. § 2520 motion to suppress filed March 15, 1972, in the then pending criminal action *United States v. William Anderson,* Criminal No. 602–71 (D.N.J.).

4. The defendants' affirmative good faith defense has been established by the record.

On the other hand, the plaintiff contends that he is entitled to summary judgment on the following grounds:

1. The electronic surveillance in question violated Title VIII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, as well as the Fourth Amendment;

2. *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), should be given retroactive application; and

3. The defendants have no absolute immunity and have failed to establish an affirmative defense of good faith.

*Material Facts As To Which There Is No Genuine Issue.*

The pleadings, answers to interrogatories and the deposition of former Attorney General Mitchell filed in this case contain the following material facts as to which there does not appear to be a genuine issue.

In June, 1970, the Philadelphia office of the FBI learned from a member of the East Coast Conspiracy to Save Lives (ECCSL) that the group was planning to damage underground heating systems in Washington, D.C. to demonstrate its opposition to the war in Vietnam. At that time the FBI was also informed that ECCSL was responsible for several draft board raids. The FBI began an investigation into these alleged activities.

On August 21, 1970, the same person informed the FBI that at least three people, including Professor William Davidon of Haverford College, had discussed the possibility of kidnapping Henry Kissinger. The Government was furnished with copies of letters in which the idea was considered. These letters were written by two members of ECCSL, Father Phillip Berrigan and Sister Elizabeth McAlister. This information was relayed to the Attorney General, Dr. Kissinger and Presidential Assistant John Ehrlichman in a memorandum by FBI Director J. Edgar Hoover on September 4, 1970. The Philadelphia office of the FBI was assigned primary responsibility for the criminal investigation and was directed to prepare a comprehensive report concerning ECCSL.

On October 12, 1970, the Philadelphia office of the FBI requested the Department of Justice to evaluate the report it had prepared "for a prosecutive opinion." At that time the Philadelphia office was "considering electronic surveillance feasibility for William Davidon." On November 13, 1970, a Department of Justice report concluded that there was a "reasonably good prosecutable case against eleven individuals" with respect to the draft board case, but that there was "not sufficient evidence to obtain a conviction" for the conspiracy to kidnap Dr. Kissinger or to damage the utility system in Washington, D.C.

On November 6, 1970, at the request of the FBI, Attorney General Mitchell authorized the wiretap on Davidon that is the subject of this lawsuit. This tap was placed and continued with one extension, until January 6, 1971. The sworn answers of FBI Special Agent Fields reveal that in the view of the Federal Bureau of Investigation, the electronic surveillance upon which plaintiff's conversations were overheard was instituted for the purpose of gathering intelligence-type information under circumstances where it was also anticipated that information of a criminal evidentiary nature might be obtained. He further stated that under the guidelines which had been issued to FBI field offices concerning electronic surveillance authorized by the Attorney General for national security intelligence gathering purposes, monitoring personnel were instructed to monitor and record conversations unless it was known that a particular individual speaking on the surveilled telephone line was a defendant in a federal criminal case or an attorney for a defendant in a federal case. With respect to the national security electronic surveillance on which plaintiff's conversations were overheard, neither the subject of that surveillance nor other individuals whose

conversations were expected to be overheard were defendants or attorneys for defendants in a federal criminal case, and therefore no particular instructions were given the two FBI employees "to minimize the interception of communications not relevant to the alleged purposes for the interceptions." The plaintiff was overheard on three occasions.

A federal grand jury in Harrisburg, Pennsylvania began hearing evidence on December 13, 1970 regarding a plan to destroy underground utility tunnels in Washington, D.C. and to kidnap Dr. Henry Kissinger. In 1971 true bills were found in connection with two indictments, the prosecution of which became known as the trial of the Harrisburg Eight.

*The Warrantless Electronic Surveillance In This Case Violated The Fourth Amendment.*

■ Since 1967, when the United States Supreme Court handed down its decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), there has been little doubt that, except for certain well-delineated exceptions,[4] a warrant is necessary for electronic surveillance of criminal activity unrelated to the national security interest. Furthermore, since 1972 when the Supreme Court decided *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), there has

been little doubt that a warrant is also necessary in matters involving the national security interest, except for surveillances based on threats to the national security involving foreign powers.[5] It follows, therefore, that the warrantless electronic surveillance placed on the telephone of William Davidon in November 1970 was unconstitutional. The memorandum by which the Attorney General personally authorized this wiretap claimed that it was necessary to protect the national security interest in connection with the activities of a domestic organization. The Government made no claim that a foreign power was involved. Since *District Court,* there is no question that such a warrantless electronic surveillance is unconstitutional. In this civil action for damages, wherein the plaintiff claims that he was overheard on the warrantless wiretap, the issue presented is whether the plaintiff is entitled to recover monetary damages under either 18 U.S.C. §§ 2510–2520 or the Fourth Amendment.

*District Court Should Not Be Given Nonretroactive Application.*

The defendants take the position that no liability on plaintiff's Fourth Amendment claim should be imposed in this civil litigation because under *Chevron Oil v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), *District Court* should be given only prospective application.[6] In *Chevron Oil,*

---

4. *See, Katz,* 389 U.S. at 357–58, 88 S.Ct. 507.

5. *United States v. Butenko,* 494 F.2d 593 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974). *But see, Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) (en banc), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

6. We are not dealing with a criminal case and therefore do not consider Supreme Court decisions in that area. Justice Harlan characterized the Supreme Court's application of the nonretroactivity doctrine in criminal cases in *Desist v. United States,* 394 U.S. 244, 256–57, 89 S.Ct. 1030, 1038, 22 L.Ed.2d 248 (1969) (dissenting opinion):

 In the four short years since we embraced the notion that our constitutional decisions in criminal cases need not be retroactively applied, *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), we have

created an extraordinary collection of rules to govern the application of that principle. We have held that certain "new' rules are to be applied to all cases then subject to direct review, *Linkletter v. Walker, supra;* *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); certain others are to be applied to all those cases in which trials have not yet commenced, *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); certain others are to be applied to all those cases in which the tainted evidence has not yet been introduced at trial, *Fuller v. Alaska,* 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968); and still others are to be applied only to the party involved in the case in which the new rule is announced and to all future cases in which the proscribed official conduct has not yet occurred. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *De Stefa-*

the United States Supreme Court set out the criteria for deciding when a decision should be given nonretroactive application in a civil case:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . . Second, it has been stressed that 'we must . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' *Linkletter v. Walker, supra,* 381 U.S. at 629, 85 S.Ct. 1731. Finally, we [must] weigh the inequity, imposed by retroactive application for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by holding of nonretroactivity." *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). *Id.* at 106–07, 92 S.Ct. at 355.[7]

As to whether *District Court* overruled a "clear past precedent," we find that prior to *District Court,* there was no clear rule of law which would have authorized the warrantless electronic surveillance in the instant case. Thus, *District Court* did not overrule any clear past precedent. Whether *District Court* decided "an issue of first impression whose resolution was not clearly foreshadowed" in November 1970 when the wiretap in this case was placed, presents a more difficult question. Prior to the decision in *District Court* in June 1972, several federal courts had been presented with the precise question decided in *District Court,* but they had reached divergent conclusions. On one hand, Judge Hoffman held in *United States v. Dellinger,* 69 CR 180 at 20 (N.D.Ill. Feb. 20, 1970):

> no v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968).

because the matter of when electronic surveillance is reasonably necessary to investigations carried out to protect the national security is a matter not suitable for a judicial determination, but is rather best left to the authorization of the President or his chief legal officer, the Attorney General, I conclude that *electronic surveillance in national security cases is not subject to the warrant requirements* of the Fourth Amendment. (emphasis added).

And Chief Judge Stanley of the District of Kansas stated on the record in *United States v. O'Neal,* KC–CR–1204 on September 1, 1970:

> all of the [warrantless] interceptions, the wiretaps, in this case, . . . *were legally obtained within the inherent constitutional power of the President* because of his responsibility to gather intelligence information having to do with matters vital to national security . . . (emphasis added).

On the other hand, Judge Ferguson stated in *United States v. Smith,* 321 F.Supp. 424, 429 (C.D.Cal.1971), on January 8, 1971, just two days after the Davidon tap was removed:

> [t]his court is forced to conclude that in wholly domestic situations *there is no national security exemption from the warrant requirement* of the Fourth Amendment. (emphasis added).

Shortly thereafter, the district court judge in *District Court* stated in response to the Government's claim that the President, acting through the Attorney General, is clothed with the power to authorize warrantless wiretaps for domestic security purposes:

> [i]n the opinion of this Court, the position of the Attorney General is untenable. *It is supported neither historically, nor by the language of the Omnibus Crime Act.* Such power held by one individual was

7. For an excellent discussion of this portion of *Chevron Oil,* see Judge Gibbons' analysis in *Kacher v. Pittsburgh Nat'l Bank,* 545 F.2d 842, 849–52 (3d Cir. 1976) (dissenting opinion).

never contemplated by the framers of our Constitution and cannot be tolerated today. *United States v. Sinclair,* 321 F.Supp. 1074, 1079 (D.Mich.1971), *aff'd sub nom. United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (emphasis added).

The most relevant Supreme Court case prior to *District Court* was *Katz,* wherein the Court made it clear that a warrant was necessary for all types (even nontrespassory) of electronic surveillance of criminal activity unrelated to the national security interest. In *Katz,* Justice Stewart stated in the majority opinion:

> [w]hether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case. 389 U.S. at 359 n. 23, 88 S.Ct. at 515.

Although six other Justices agreed with the decision of the Court, three felt compelled to write concurring opinions in order to express their views on this issue. Justice White wrote:

> [w]e should not require the warrant procedure and the magistrate's judgment if the President of the United States or his chief legal officer, has considered the requirements of national security and authorized electronic surveillance as reasonable. *Id.* at 364, 88 S.Ct. at 518.

Justice Douglas, with Justice Brennan joining, wrote:

> [n]either the President nor the Attorney General is a magistrate. In matters where they believe national security may be involved they are not detached, disinterested, and neutral as a court or magistrate must be. Under the separation of powers created by the Constitution, the Executive Branch is not supposed to be neutral and disinterested. Rather it should vigorously investigate and prevent breaches of national security and prosecute those who violate the pertinent federal laws. The President and Attorney

General are properly interested parties, cast in the role of adversary, in national security cases. They may even be the intended victims of subversive action. Since spies and saboteurs are as entitled to the protection of the Fourth Amendment as suspected gamblers like petitioner, [we] cannot agree that where spies and saboteurs are involved adequate protection of the Fourth Amendment rights is assured when the President and Attorney General assume both the position of adversary-and-prosecutor and disinterested, neutral magistrate. *Id.* at 359–60, 88 S.Ct. at 516.

In view of our determination in connection with the second and third criteria for nonretroactivity, we do not find it necessary to decide the question of whether *District Court* decided "an issue of first impression whose resolution was not clearly foreshadowed" in 1970.[8]

The second criterion for nonretroactivity set forth in *Chevron Oil* is whether application will further or retard the purpose of the ruling. The purpose of the rule enunciated in *District Court* was to protect people from unwarranted intrusions into their privacy by the administrative arm of their government. Denying nonretroactivity will not retard, but should encourage vigilance and solicitude for the Fourth Amendment rights of persons, particularly in close cases.

The third and final criterion for nonretroactivity in *Chevron Oil* is whether there will be injustice or hardship to the parties. In this case, as we hereinafter determine, the defendants will be afforded an opportunity to establish a good faith defense. Obviously, retroactive application is not inequitable to the plaintiff. Thus, none of the parties will suffer an unjust hardship if *District Court* is retroactively applied. In view of our determination that the second and third criteria of *Chevron Oil* have not been met, we conclude that the record in this civil case does not support a

---

**8.** The use of warrantless electronic surveillance by previous Presidents and Attorneys General is discussed in *District Court, supra,* 407 U.S. at 310, 92 S.Ct. 2125 and in *Zweibon,* 170 U.S.App.D.C. at 23, 516 F.2d at 616.

holding of nonretroactivity pursuant to *Chevron Oil.*[9]

*The Electronic Surveillance In This Case Is Subject To The Procedures And Remedies Of 18 U.S.C. §§ 2510–2520.*

The defendants contend that the national security electronic surveillance in this case does not violate any of the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. The basis of their contention is that § 2511(3) of the Act exempts electronic surveillances conducted for national security purposes. Section 2511(3) provides:

> (3) Nothing contained in this chapter . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. . . .

The United States Supreme Court stated in *District Court* that the purpose of § 2511(3) was to "provide that the Act shall not be interpreted to limit or disturb such power as the President may have under the Constitution. In short, Congress simply left presidential powers where it found them." 407 U.S. at 303, 92 S.Ct. at 2130.

The question as to whether electronic surveillance for national security purposes became subject in 1968 to the procedures and remedies of 18 U.S.C. §§ 2510–2520 was determined by the District of Columbia Circuit in *Zweibon v. Mitchell,* 170 U.S.App. D.C. 1, 516 F.2d 597 (1975) (en banc), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). In an opinion for the plurality by Judge Wright, the court held that electronic surveillance of the type involved in the instant case is subject to both the procedures and the remedies provided by the Act.[10] In his opinion Judge Wright reasoned:

**9.** Nonretroactive application of new Fourth Amendment doctrines is frequently mandated in criminal cases. *See, e. g., Desist v. United States,* 394 U.S. 244, 247–48, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969). Nevertheless, *District Court* was not given nonretroactive application when the electronic surveillance at issue in this case was challenged in the criminal trial of *United States v. Ahmad,* 335 F.Supp. 1198, 1200 (M.D.Pa.1971), wherein Judge Herman ruled the wiretap illegal under *District Court,* and, therefore, ordered the fruits of the surveillance suppressed. Furthermore, the Third Circuit, when presented with these determinations, stated, 499 F.2d 851, 853 n. 2 (3d Cir. 1974):

> Judge R. Dixon Herman, who presided over the [Harrisburg Eight] case, found that there had been an unauthorized and illegal wiretap.[2]
>
> [2] The electronic surveillance apparently had been performed without a court order in accordance with a Presidential determination that national security was involved. Judge Herman relied on the decision of the Court of Appeals in *United States v. United States District Court,* 444 F.2d 651 (6th Cir. 1971), later affirmed by the United States Supreme Court at 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) in deciding that the wiretap was illegal.

**10.** Judge Wright described the responsibility of the judiciary in the area of electronic surveillance for "national security" as follows:

> Undoubtedly the President, our Chief Executive and Commander-in-Chief of our Armed Forces, is imbued by the Constitution with vast and indispensable powers for dealing with the vital problems generated by our relations with foreign powers, including the duty to protect this country from foreign aggression or subversion. The very existence of such tremendous power, however, renders it susceptible to abuse and endangers those fundamental personal liberties which the Government was instituted to secure for its citizens and whose exercise elevates the nation to a statute worthy of defense. Thus, although the attempt to claim Executive prerogatives or infringe liberty in the name of security and order may be motivated by the highest of ideals, the judiciary must remain vigilantly prepared to fulfill its own responsibility to channel Executive action within constitutional bounds. 170 U.S.App.D.C. at 8–9, 516 F.2d at 604–05 (footnotes omitted).

Since we do not believe the [*District Court*] case held the standards and procedures of Title III to be inapplicable when a purported national security surveillance is involved, we must look to the language and legislative history of Section 2511(3) to determine congressional intent in its enactment. Section 2511(1) unequivocally declares that '[e]xcept as specifically provided in this chapter,' interception of '*any* wire or oral communication' is illegal. Section 2511(3), however, only states that '[n]othing contained in this chapter * * * shall limit the *constitutional* power of the President' to take the actions he deems necessary in the field of national security. Since Section 2511(3) is merely a disclaimer that 'constitutional' actions by the President are not to be invalidated under the statute, it is reasonable to assume that Congress intended to prohibit 'unconstitutional' Executive surveillance, which would therefore be 'in violation of this chapter' within the comprehension of the damages provision of Title III. Thus, even if the *procedures* of Title III were inapplicable to national security wiretapping, the *remedies* of Title III should apply to *unconstitutional* exercises of presidential power.

An analysis of the legislative history of Title III also indicates that it would be reasonable to interpret Section 2511(3) as a statement that the question reserved in *Katz* should be left for judicial resolution, but that, *to the extent the President does not have the constitutional power to engage in warrantless surveillance activities, the procedures and remedies of Title III are fully operative.* This interpretation is fully consistent with the [*District Court*] Court's understanding of the legislative history of Section 2511(3) and the two-decade struggle in Congress concerning wiretap legislation.

*Id.* at 67–68, 516 F.2d at 663–64 (emphasis supplied in part). *Accord, Kinoy v. Mitchell,* 331 F.Supp. 379, 382 (S.D.N.Y.1971).

We agree with *Zweibon* that the procedures and remedies of Title III apply to all electronic surveillance which must, by virtue of the Fourth Amendment, be conducted pursuant to a warrant. Since, as we have heretofore pointed out, a warrant was constitutionally required under the circumstances of this case, it would appear that the remedies provided in Title III should be made available to the plaintiff, unless the defendants establish an affirmative good faith defense, as hereinafter discussed.[11]

*The Defendants Are Limited To An Affirmative Good Defense.*

The defendants seek to avoid liability by asserting that they have an absolute immunity from suit for discretionary acts done within the scope of their authority because they are high ranking government officials. They contend that this is the law in the Third Circuit and cite three pre-1975 cases: *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31, 43 (3d Cir. 1974), *vacated,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); *Fidtler v. Rundle,* 497 F.2d 794, 802 (3d Cir. 1974); and *Johnson v. Alldredge,* 488 F.2d 820, 824 (1974). However, as the Third Circuit stated in *Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53, 59– 60 (3d Cir.) (en banc), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976):

[u]pon . . . consideration we conclude that *Wood v. Strickland* [420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)] significantly modified the law of immunity upon which we relied in affirming the district court . . . . It was our view [then] that if the government officials performing discretionary government duties acted within the scope of their official responsibilities, they were immune from damage actions . . . . .

*Wood v. Strickland, supra,* demonstrates that we erred in assuming that there still existed an unqualified, common

---

11. Although it does not appear that the defendants are contending that the nonretroactivity doctrine of *Chevron Oil* should be applied to nullify the effect of Title III in this case, it is nevertheless our opinion that the reasons hereinbefore stated for the retroactive application of *District Court* would likewise be applicable here.

law immunity covering nonjudicial . . government officials performing adjudicatory functions.

It therefore appears that government officials, even high ranking government officials such as the Attorney General of the United States, no longer have available to them the defense of absolute immunity on the ground that they were performing discretionary duties within the scope of their official responsibilities.

We must determine, however, whether the Attorney General, who, next to the President, is our nation's highest executive officer directly responsible for the administration of justice, is entitled to an absolute immunity in connection with his authorization of the unconstitutional electronic surveillance in this case. Fortunately *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) provides some guidance for the resolution of this issue. In *Imbler,* the United States Supreme Court decided that a state prosecuting attorney who acted within the scope of his duties by initiating and pursuing a criminal prosecution was entitled to absolute immunity. In arriving at its determination that a prosecutor does have absolute immunity in the performance of acts "intimately associated with the judicial phase of the criminal process," the Court placed reliance upon *Yaselli v. Goff,* 12 F.2d 396 (2d Cir. 1926), *aff'd per curiam,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), in which absolute immunity was granted to a special assistant to the Attorney General of the United States in connection with an action of malicious prosecution based on an indictment and prosecution. In delineating the boundaries of its holding, however, the Court stated:

> [w]e agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or similar reasons require immunity for

those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983. 424 U.S. at 430, 96 S.Ct. at 995.

Here we are concerned with actions of the Attorney General in authorizing a warrantless wiretap. As the *Imbler* Court stated in a footnote:

> [p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them. *Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33.

It is therefore our opinion that in authorizing the warrantless wiretap in this case, the Attorney General was functioning as an administrator rather than as an officer of the court. We must conclude that the Attorney General is not entitled to absolute immunity in connection with this warrantless electronic surveillance.

*The Defendants May Assert A Good Faith Affirmative Defense To Plaintiff's Fourth Amendment Claim.*

 In *Zweibon,* decided prior to the Supreme Court's pronouncements in *Imbler,* the District of Columbia Circuit Court determined that in a civil action for damages, the Attorney General was entitled to assert a good faith defense in connection with his authorization of a warrantless wiretap.[12] We shall follow the lead of our learned colleague, Judge VanArtsdalen, in *Burkhart v. Saxbe,* 397 F.Supp. 499, 502 (E.D.Pa.1975) and hold that the Attorney General and the two FBI agents, the defendants who re-

---

12. See also, Halperin v. Kissinger, 424 F.Supp. 838, 842, 844 n. 8, 845 (D.D.C.1976); Hallinan v. Mitchell, 418 F.Supp. 1056, 1057 (N.D.Cal. 1976).

main in this case, are permitted a good faith defense to the plaintiff's Fourth Amendment claim. The burden is therefore on the defendants, as stated in *Skehan,* to come forward and convince the trier of fact by a preponderance of the evidence that (1) they did not know and reasonably need not have known that their actions would constitute a violation of plaintiff's constitutional rights; and (2) they acted without a malicious intention to deprive the plaintiff of his constitutional rights or cause him to suffer other injury.

*The Defendants May Assert A Good Faith Affirmative Defense To Plaintiff's Statutory Claim.*

■ We are also presented with the question whether there is any defense available to the defendants in connection with the plaintiff's claim for damages pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. *Zweibon* is the only case specifically discussing this issue which has been called to our attention. In *Zweibon,* after holding that the electronic surveillance authorized in 1970 by the Attorney General without a court order was illegal, the court concluded that Congress intended that the defendants should have a good faith defense to the statutory claim, although § 2520 of Title 18 specifically provides:

A good faith reliance on a court order or on the provisions of section 2518(7) of this chapter shall constitute a complete defense to any civil or criminal action brought under this chapter.[13]

In accordance with *Zweibon,* we hold that the defendants shall have the opportunity to present the same good faith defense to the plaintiff's statutory claim, as heretofore set forth from the *Skehan* decision.

*A Genuine Issue Of Material Fact Exists.*

The defendants urge this Court to enter summary judgment in their favor. It is their position that the record establishes their good faith affirmative defense. Other than the pleadings and briefs, the only documents which have been filed are defendants' answers to interrogatories and the deposition of John Mitchell. The plaintiff opposes this motion, but has filed no affidavits or depositions. As heretofore determined, the defendants have the burden of establishing by a preponderance of the evidence that (1) they did not know and reasonably need not have known that conducting the warrantless wiretap in this case was unconstitutional; and (2) they acted without malicious intention to (a) deprive the plaintiff of his constitutional rights or (b) cause him to suffer other injury. *Skehan, supra.*

■ In connection with the defendant's motion for summary judgment, the law is clear that the defendants have the burden of demonstrating that there is no genuine issue of material fact. *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.,* 190 F.2d

---

**13.** Title 18 U.S.C. § 2518(7) provides:

Notwithstanding any other provision of this chapter, any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof acting pursuant to a statute of that State, who reasonably determines that—

(a) an emergency situation exists with respect to conspiratorial activities threatening the national security interest or to conspiratorial activities characteristic of organized crime that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, and

(b) there are grounds upon which an order could be entered under this chapter to authorize such interception,

may intercept such wire or oral communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained in violation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application.

817, 824 (3d Cir. 1951), quoted with approval in *Ettinger v. Johnson*, 556 F.2d 692, 696 (3d Cir. 1977). Moreover, in considering the motion for summary judgment, the Court must view the evidence in a light most favorable to the party opposing the motion. *Goodman v. Mead Johnson & Company*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In considering the evidence contained in the deposition of John Mitchell and the defendants' answers to interrogatories in a light most favorable to the plaintiff, it is apparent that there are genuine issues of material fact concerning the good faith defense of the defendants. As the Third Circuit in *GAF v. Amchem Products, Inc.*, 570 F.2d 457 at 461 (3d Cir. 1978) pointed out: "[a] factfinder might draw a different inference, but on a motion for summary judgment the inference favorable to [the party opposing the motion] must prevail." Furthermore, as stated in *Toebelman v. Missouri-Kansas Pipe Line Company*, 130 F.2d 1016, 1018 (3d Cir. 1974), "[t]he evidence contradicting or impeaching that of the movant . . . may appear in the movant's own evidentiary materials." Finally, Wright & Miller, *Federal Practice & Procedure* § 2712, at 278–82 (1973), quoted with approval in *Rosenthal v. Rizzo*, 555 F.2d 390, 393 (3d Cir. 1977), provides: "[a] motion for summary judgment lies only when there is no genuine issue of material fact; summary judgment is not a substitute for the trial of fact issues."

With respect to the plaintiff's motion for summary judgment, we find that in viewing the evidence in the deposition and answers to interrogatories in a light favorable to the defendants, the plaintiff has likewise failed to carry his burden of demonstrating that there is no genuine issue of material fact.

Furthermore, after making its determination that the defendants in *Skehan* were entitled to a good faith defense, the Court remanded the case for "findings of fact with respect to the [good faith] immunity of each defendant." Accordingly, an order will be entered denying the parties' cross-motions for summary judgment on the ground that there are genuine issues of material fact in connection with the defendants' affirmative defense of good faith.